### 2944.   CROSBY *v.* POTTS, sheriff.

1. Every citizen owes to the State the duty of giving in the courts of justice, when he is required to do so, testimony as to such matters as fall within his knowledge, where there is no exemption or privilege protecting the matters from disclosure.
2. The courts, as an arm of the State, have the inherent power adequately to control, in the furtherance of justice, officers, parties, jurors, witnesses, and others connected with a pending case.
3. A court, in order to secure the presence of a witness in a criminal case, and to prevent his leaving the jurisdiction of the court prior to the trial, may require that he shall give bail for his appearance, and, in default of his giving bail, cause him to be held in confinement.   This power probably existed in the courts at common law.
4. This requirement, being harsh and oppressive, should never be resorted to except in extreme cases.   It is a matter, however, resting in the sound discretion of the court.

DECIDED NOVEMBER 29, 1910.

Habeas corpus; from city court of Sylvester—Judge Williamson. September 10, 1910.

*Perry, Foy & Monk,* for plaintiff.

*J. H. Tipton,* for defendant.

POWELL, J.   On September 1, 1910, during a term of the city court of Sylvester, the judge ordered from the bench that the plaintiff in error, Crosby, who had been subpoenaed as a witness for the State in a criminal case pending before the court, should be held for that purpose by the sheriff, and that he be committed to jail for the purpose of securing his presence at the trial, unless he would enter into bail in the sum of $200, conditioned for his appearance at the trial.   This order was orally delivered, and the sheriff took Crosby into custody.   He sued out habeas corpus. After the issuance of the writ, indeed on the very day the habeas corpus case was tried (but during the same term of the court), namely, on September 10, 1910, the order previously announced orally was reduced to writing; all the facts, including the previous oral announcement of the order, being recited.   It appearing that the witness still refused to give bail for his appearance at the trial, the court refused to release him on habeas corpus; and to this judgment exception is taken.   Some point is made as to the original order of the court being oral; but as it was reduced to writing during the same term of the court and before judgment in the habeas corpus case was rendered, we may dispose of this summarily with the general statement that the point is not well taken.

The chief contention of the plaintiff in error, the one of serious import, is that the court had no power to pass the order committing the witness to jail unless he would give bail for his appearance. It is insisted that no such power existed at common law, and that it has not been given by statute in this State.   It is conceded that under the Penal Code of 1895, § 915, the power has been conferred on committing courts to require suitable bonds of the witnesses in criminal cases, but the city court in the present case was not sitting as a committing court, as the case was before it for trial in chief.   The powers of the judge of the city court are, under the act creating the court, the same as those of a judge of the superior courts in similar matters.

The history of testimonial compulsion is a rather interesting subject.   It is to be remembered that at early common law, and indeed in the English practice of medieval times, witnesses, as such, did not appear in judicial procedure.   In the rudimentary trials of those days, those who had information, direct or indirect, as to matters in dispute came to court not as witnesses, but as

sectors (or suitors), oath-helpers, or jurors. Even in later days (as late as the seventeenth century) the defendant in a criminal case was not allowed to introduce the testimony of witnesses sworn in his behalf. However, in the old days of the ordeal, it seems that the defendant might plead alibi as an *exceptio*, thus assuming the burden of proof; and then might bring sectors or oath-helpers to support his *exceptio*. A survival of this last mentioned practice may be noticed in the absurd doctrine, still prevailing in this State, that while the prosecution must, as a part of the State's case, show the defendant's presence at the commission of the crime beyond a reasonable doubt, the defendant, if he pleads alibi, must establish his absence to the reasonable satisfaction of the jury. By Stat. 7 and 8 Wm. III, c. 3, § 7 (1695), the defendant in cases of treason and misprision was allowed compulsory process to obtain witnesses; and by Stat. 1 Anne, c. 9, § 3 (1702), witnesses produced for the accused in cases of felony might be sworn. But even prior to these dates and prior to Stat. 5 Eliz., c. 9, § 12 (1562), allowing the issuance of subpœnas for witnesses in civil cases, the courts of England as a part of their inherent powers, were accustomed to compel the attendance of witnesses on behalf of the crown. Prior to the statute of Elizabeth just mentioned, persons who, not being legally interested in the subject-matter of the case, undertook voluntarily to appear as witnesses were subject to prosecution and punishment for the crime of maintenance. Primarily, the statute of Elizabeth merely gave a way by which witnesses might attend upon the court without their being rendered liable to the charge of maintenance; but incidentally it aided the development of the nascent notion, which since then has come into full recognition by the courts of England and of this country, that every man owes to his king or his country the duty of testifying in court, where he has information which can aid in disclosing the truth of any matter under legal investigation. In 1612 we find Sir Francis Bacon declaring in the case of Countess of Shrewsbury, 2 How. St. Tr. 769, 778, "You must know that all subjects, without distinction or degrees, owe to the King tribute and service, not only of their deed and hand, but of their knowledge and discovery." In the debate in Parliament in 1742 upon the bill to pardon in advance those who would incriminate themselves in testifying to the frauds of the Earl of Oxford, we find the fol-

lowing expressions on the subject: Duke of Argyle: "On the present occasion, my lords, I pronounce with the utmost confidence, as a maxim of indubitable certainty, 'that the public has a claim to every man's evidence,' and that no man can plead exemption from this duty to his country." Lord Chancellor Hardwicke: "It has, my lords, I own, been asserted by the noble duke, that the public has a right to every man's evidence,—a maxim which in its proper sense can not be denied. For it is undoubtedly true that the public has a right to all the assistance of every individual." See Cobbett's Parliamentary Hist., Vol. 12, pp. 675, 693.

Just how the performance of this duty of giving testimony should be compelled is a matter which from time to time has been the subject of various statutes; but the better view seems to be .that it has ever been one of the inherent powers of courts to devise ways to compel all persons to perform this testimonial duty, except in so far as they may, for special reasons, have been made exempt from testifying either generally or specially.

We do not think that the contention of counsel is well taken that no power existed at common law by which the courts could compel a witness to give bail for his appearance at the trial. As Bayley, B., said as to a somewhat similar proposition in the case of Summers *v.* Moseley, 2 Cr. and M. 489, "Prior to that statute [the statute of Elizabeth, supra] there must have been a power in the crown (for it would have been utterly impossible to carry on the administration of justice without such power) to require the attendance in courts of justice of persons capable of giving evidence, and the production of documents material to the cause, though in the possession of a stranger." The fact that no precedent of a common-law court's having done the precise thing done in this case does not negative the fact that the courts did have the power. As Professor Wigmore says in his great work on Evidence, speaking along this general line, "But how culpable is this self-stultifying concession by a court of justice that it knows of no process to execute its powers for enforcing a conceded duty! There can not be a precise precedent for everything. Where there is a clearly established principle, the lack of a precedent is no obstacle. There must some time be a first precedent. Were the judges of Charles II or George III, who themselves were but the followers of six centuries of royal judges, the last generation.

vested with the authority to apply old principles in new forms?
Nobody has been able to find any definite authority for the duces
tecum form of subpœna; but the judges of 1808 were not moved
by such trifling; such a power, they declared, is 'essential to the
very existence and constitution of a court of common law.' The
mere phrasing of an auxiliary writ is not to stand in the way of
inherent powers. Is there any known precedent of a writ to a
court-bailiff ordering him to shut the doors to keep out an ex-
cessive throng, or to open the windows to let in fresh air? But
no judge ever refrains from such orders because he has never seen
such a form. The ordinary subpœna for a witness is of no avail
when he is in prison; but the judges—somebody, some time, no
one knows who or when—varied the form of words and ordered the
jailer habeas corpus ad testificandum. They did not supinely sit
and watch justice defrauded of testimony because the usual piece
of parchment did not precisely fit the exigency."

We believe that the power to take every adequate means to com-
pel the attendance of witnesses or the production of testimony in-
hered in the courts of the common law as a part of their neces-
sary powers, and that one of the objects of section 4047 of the
Civil Code of 1895 is to declare that power in favor of the courts
of this State. That section declares, among other things, that
"Every court has power . . to control, in furtherance of jus-
tice, the conduct of its officers and all other persons connected with
a judicial proceeding before it, in every matter appertaining
thereto." This language is broad. The use of the word "all" as
related to the persons to be affected, the use of the expression "con-
nected with a judicial proceeding," instead of some more restricted
phrase, such as "parties to the case," and the addition of the
language, "in every matter appertaining thereto," all seem to in-
dicate an intention to declare a plenary power in the courts to
exercise, over officers, parties, witnesses, and all others who may
become connected in any way with a case pending before the
court, such control as shall be adequate to carry out its full juris-
diction to administer legal justice in the case. Officers may be
compelled to perform duties even without pay; as where for a
pauper party the sheriff serves papers, or the clerk makes rec-
ords or copies, or an attorney is appointed and defends. Parties
may be compelled to execute consents. or to appear in person, or

to submit to physical examinations of themselves, of their property, or of their documents, and in extreme cases may be held in prison awaiting the determination of some asserted right even of a civil nature; as where a party is held under ne exeat. Third persons may be compelled to lay down their private enterprises, in order to come to the court to sit as jurors. Other outsiders may be compelled to appear as witnesses and to bring their private books and papers to be used as evidence. Many of these things thus required of the citizenry of the State are, on their face, hardships which the relationship of citizen and State impose as the result of a natural and necessary obligation.

The point is that the court as an arm of the State has the right to impose hardship upon the citizen whenever the State's interests being administered in the court require the imposition. It is a hardship upon one whose only connection with a case is that he happens to know some material fact in relation thereto that he should be taken into control by the court and held in the custody of the jailer unless he gives bond (which, from poverty, he may be unable to give), conditioned that he will appear and testify; but the exigencies of particular instances do often require just such stringent methods in order to compel the performance of the duty of the witness's appearing and testifying. There are many cases in which an ordinary subpœna would prove inadequate to secure the presence of the witness at the trial. The danger of punishment for contempt on account of a refusal to appear is sometimes too slight to deter the witness from absenting himself; especially is this true where there are but few ties to hold the witness in the jurisdiction where the trial is to be held, and there are reasons why he desires not to testify; for when once he has crossed the State line, he is beyond the grasp of any of the court's processes to bring him to the trial or to punish him for his refusal to answer to a subpœna. We conclude, therefore, that since the law manifestly intends that the courts shall have adequate power to compel the performance of the respective duties falling on those connected in any wise with the case, it may, where the exigencies so require, cause a witness to be held in custody, and in jail if need be, unless he gives reasonable bail for his appearance at the trial. The outsider who is a witness, and who in this capacity is ordered to be held in confinement unless he

gives bail, often suffers less hardship than the outsider who as a juror is held in confinement for days and even weeks without bail.

It is hardly necessary to say that the imprisoning of a witness to secure his attendance is a harsh remedy—one that should be very sparingly exercised. No court should ever order a witness to be imprisoned in default of bond, except from grave necessity. Unless his testimony is material and important and unless there is strong likelihood that if he is not restrained by confinement or bond he will violate the mandates of the subpœna and flee the limits of the State, the power should not be exercised. This is a matter as to which every court, when it is presented, must exercise a broad, humane discretion, having in view the rights of the citizen and the even higher rights of justice and of the State.

The present record does not disclose the grounds upon which the trial judge acted. We therefore presume that he acted upon sufficient grounds. The burden of showing an abuse of discretion was upon the party attacking the judge's order, and no such showing has been made. Only the judge's general power to pass the order has been challenged, and we hold that the power exists.

It is proper that we should add, by way of acknowledgment, that much of the information given above as to the history of testimonial duty and compulsion has been derived from a reading of Wigmore on Evidence and of Pollock and Maitland's History of English Law. *Judgment affirmed.*