STATE, Respondent, v. DAMM, Appellant.

(266 N. W. 667.)

(File No. 7390. Opinion filed April 16, 1936.)

310

For former opinion, see 62 S. D. 123, 252 N. W. 7.

*Louis H. Smith,* of Sioux Falls, and *Diamond & Jory,* of Sheldon, Iowa, for Appellant.

*Walter Conway,* Atty. Gen., and *R. F. Drewry,* Asst. Atty. Gen., for the State.

CAMPBELL, J. Defendant was convicted of second-degree rape, and this court affirmed the judgment. State v. Damm (1933) 62 S. D. 123, 252 N. W. 7. That some one had intercourse with prosecutrix at about the date charged in the information was evidenced by the fact that she bore a child in due time thereafter. Prosecutrix maintained that she had never had intercourse with any person other than defendant. Consequently, the issue of paternity became highly material. Defendant, at the trial, asked the court to require prosecutrix and her infant to furnish a few drops of blood for the purpose of having the same tested and compared with the blood of the defendant, as a result of which test defendant maintained that it might be possible to demonstrate

as a scientific fact the impossibility of his paternity. The court refused to make such an order, and we held in our former opinion that this refusal was not error. Subsequently, we granted a re-hearing limited to this particular point, and upon this point the matter has been orally re-argued and again submitted.

The scientific theory underlying the matching or testing of blood to establish impossibility of a given paternity is dealt with to some extent in our former opinion, to which reference is hereby made, and will be found set forth in complete detail in many of the authorities we shall presently cite. To attempt to restate or further explain such theory here is therefore entirely unnecessary, and we shall merely refer to it throughout this opinion as "the blood test," meaning thereby the scientific tests advocated and relied upon by the pathologists and biologists as demonstrating the possibility or impossibility of a claimed paternity, based in essence upon the presence or absence or combination of the isoagglutinogens A and B and the agglutinogens M and N in the red blood corpuscles of the mother, infant, and claimed father, and the theory of the transmission of such agglutinogens and isoagglutinogens by inheritance, all as completely explained and fully elaborated in the authorities hereinafter to be mentioned.

Our former opinion seems to have been quite widely accepted and understood, both by various writers who have commented thereon and by counsel in the case, as a holding that the reliability of the blood test was not as yet generally established or recognized by the consensus of expert opinion in the particular field of science wherein the matter lies. We did not intend so to hold, and, as a matter of fact, did not mean to express any opinion one way or the other on the abstract question of the reliability of the test as a matter of science. We endeavored to limit our ruling on the point to an appreciably different and much narrower proposition; to wit: "That it does not sufficiently appear from the record in this case that modern medical science is agreed upon the transmissibility of blood characteristics to such an extent that it can be accepted as an unquestioned scientific fact that, if the blood groupings of the parents are known, the blood group of the offspring can be necessarily determined, or that, if the blood groupings of the mother and child are known, it can be accepted as a positively

established scientific fact that the blood group of the father could not have been a certain specific characteristic group. In other words, we think it insufficiently appears that the validity of the proposed test meets with such generally accepted recognition as a scientific fact among medical men as to say that it constituted an abuse of discretion for a court of justice to refuse to take cognizance thereof, as would undoubtedly be the case if a court to-day should refuse to take cognizance of the accepted scientific fact that the finger prints of no two individuals are in all respects identical." State v. Damm, supra, 62 S. D. 123, at page 136, 252 N. W. 7, 12.

In view of the fact that our opinion seems generally to have been interpreted as passing upon the broader and more abstract question of the existence of reliability as a matter of established scientific fact; in view of the novelty and importance of the matter; and particularly in view of the fact that we do not wish any misapprehension as to the views of this court by any possibility to deter other courts from accepting and acting upon a tenet of biological science which we are convinced is now fully ripe for acceptance in medico-legal cases, we deem it proper at this time to state, for whatever it may be worth, our actual opinion on the abstract question, notwithstanding the fact (as will more fully hereinafter appear) that it is also our view that the determination of the abstract question favorably to appellant's contentions is not decisive of the present appeal.

We therefore say, without further elaboration or discussion, that it is our considered opinion that the reliability of the blood test is definitely, and indeed unanimously, established as a matter of expert scientific opinion entertained by authorities in the field, and we think the time has undoubtedly arrived when the results of such tests, made by competent persons and properly offered in evidence, should be deemed admissible in a court of justice whenever paternity is in issue. The matter is discussed at length by Dean Wigmore in his customary comprehensive and adequate fashion in the 1934 Supplement to the Second Edition of his treatise on Evidence at pages 149-160. Among technical articles and works on the subject (in addition to those cited by Dean Wigmore in note 1, p. 150 of his Supplement), the following may be

mentioned: "Blood Test for Determination of Fatherhood" (Journal Am. Med. Assn., March 31, 1928, p. 1057); Schiff, "Medico-Legal Significance of Blood Groups" (The Lancet, Nov. 2, 1929, p. 921); "Blood Tests for Paternity" (Journal Am. Med. Assn., Aug. 30, 1930, p. 681); Lattes, "Individuality of the Blood" (Rev. Ed. Oxford Univ. Press, 1932); Swetlow, "Symposium on the Forensic Value of Tests for Blood Grouping" (Med. Times and Long Island Med. Journal, July 1932, p. 203); Pepper & Farley, "Practical Hematological Diagnosis" (W. B. Saunders Co., Philadelphia, 1934, pp. 195 et seq.); Landsteiner, "Forensic Application of Serologic Individuality Tests" (Journal Am. Med. Assn., Oct. 6, 1934, p. 1041); Wiener, "Blood Groups and Blood Transfusion" (Charles C. Thomas, Springfield, Ill., 1935); Wiener, "Determining Parentage" (The Scientific Monthly, April 1935, No. 235, p. 323). For discussion of the point in legal periodical literature, with much citation of scientific authority, see: VII St. John's Law Rev. 253 (May 1933); VIII St. John's Law Rev. 70 (Dec. 1933); IX St. John's Law Rev. 102 (Dec. 1934); 43 Yale Law Journal 651 (Feb. 1934); 82 Univ. Pa. Law Rev. 654 (April 1934); 9 Wis. Law Rev. 314 (April 1934); XIX Iowa Law Rev. 625 (May 1934); 32 Mich. Law Rev. 987 (May 1934); I Univ. Chicago Law Rev. 798 (May 1934); XXV Journal Crim. Law and Criminology 121 (May-June 1934); XXV Journal Crim. Law and Criminology 187 (July-August 1934); XX Cornell Law Quarterly 232 (Feb. 1935); 21 A. B. A. Journal 680 (Oct. 1935).

So far as concerns adjudicated cases dealing with the point in courts in the United States, there are but few. We find none as yet reported from any court of last resort. In November, 1931, the reliability of the blood test appears to have been recognized and made the basis of granting a new trial in the court of common pleas of Fayette county, Pa., in the case of Commonwealth v. Zammarelli, 17 Pa. Dist. & Co. R. 229. In New York, the reliability of the blood test was definitely recognized and an order made for the taking of blood from a plaintiff and her infant child in a very able opinion, showing complete familiarity with the subject, by Mr. Justice Steinbrink of the Supreme Court for Kings county. Beuschel v. Manowitz (1934) 151 Misc. 899, 271 N. Y. S. 277. This application and order appear to have proceeded under section 306 of

the Civil Practice Act, a statute very similar in scope to our own chapter 179, Laws S. D. 1921. The New York statute reads as follows: "In an action to recover damages for personal injuries, if the defendant shall present to the court satisfactory evidence that he is ignorant of the nature and extent of the injuries complained of, the court, by order, shall direct that the plaintiff submit to a physical examination by one or more physicians or surgeons to be designated by the court or judge, and such examination shall be had and made under such restrictions and directions as to the court or judge shall seem proper. If the party to be examined shall be a female she shall be entitled to have such examination before a physician or surgeon of her own sex. The order for such physical examination, upon the application of the defendant, may also direct that the testimony of such party be taken by deposition pursuant to this article."

The ruling of Mr. Justice Steinbrink, however, was presently reversed by the Appellate Division (same title, 241 App. Div. 888, 272 N. Y. S. 165, 166) in a brief opinion; the complete text of which is as follows: "Order directing plaintiff and her child to permit the taking of blood for the purpose of determining defendant's paternity of the child reversed on the law and the facts, without costs, and motion denied. Plaintiff may submit or not to the taking of her own blood, but it plainly determines nothing. She asserts, and no one would gainsay it, that she is the mother of this child. A blood test of the defendant and the child may possibly determine his nonpaternity, but it is not claimed, as we understand the record, that such a blood test would determine the defendant's paternity. This child is not a party to this action; and while a court of chancery has an inherent jurisdiction over the welfare of an infant, a ward of the court, nothing in this case indicates in the slightest that the welfare of this infant is in any wise involved or that the blood test could possibly be beneficial to the infant. Section 306 of the Civil Practice Act has no application to the facts of this case."

Motions for reargument and for leave to appeal were denied by memorandum decision (241 App. Div. 887, 271 N. Y. S. 1089) and the Court of Appeals refused to consider the matter on the ground that the order was not a final order. Same title, 265 N. Y. 509,

193 N. E. 295. The Appellate Division appears to have been quite right in holding that " section 306 of the Civil Practice Act has no application to the facts of this case:" We are entirely unable to agree with that court, however, in their further view (necessarily implicit in their reversal) that a trial court of record cannot order the taking of blood for the purposes of test in an effort to establish non-paternity, unless there is some specific statute authorizing such procedure. Incidentally it may be noted that statutes have now been enacted in New York (very possibly as a result of the holding of the Appellate Division in the Beuschel Case) which inferentially recognize the scientific reliability of the blood test and specifically authorize courts to order the furnishing of blood for test purposes. Chapters 196, 197, 198, Laws N. Y. 1935, effective March 22, 1935. And a comparable statute which likewise recognizes the validity of the test was also enacted a few months later in Wisconsin. Chapter 351, Laws of Wisconsin 1935, approved August 9, 1935.

██ Statutes similar to section 306 of the New York Civil Practice Act exist in many jurisdictions and have been universally upheld. They apply usually to parties plaintiff in certain types of actions. Under earlier but quite similar statutes (chapter 721, Laws N. Y. 1893; chapter 428, Laws N. Y. 1894), it was held that the provision for physical examination of a plaintiff before trial was amply sufficient to justify the court in ordering such plaintiff to submit to the taking of a sample of blood for analysis. Hayt v. Brewster, Gordon & Co. (1921) 199 App. Div. 68, 191 N. Y. S. 176. The opinion points out that such an order should be, and readily can be, surrounded with all proper safeguards, and that the taking of the blood should be done by a physician of plaintiff's selection if he so desires. It would seem quite clear that physical examination or the taking of a few drops of blood does not amount, therefore, to an infringement of any constitutional right, for if it was such infringement, manifestly the Legislature would be powerless to decree it. It is our position that a statute can neither add to nor detract from the inherent powers of the court in such a matter. Neither the Legislatures nor the courts can infringe the constitutional rights of citizens. If physical examination or the taking of a few drops of blood for testing amounted to invasion of con-

stitutional rights, it could not be justified by legislative fiat. If it is not an invasion of constitutional rights (and we think it very clearly is not), then it lies within the ambit of the inherent judicial power of courts of record, and legislative permission or authority is superfluous. Though the cases are not entirely in accord, it is distinctly the majority view that the courts have an inherent power to order physical examination even in the absence of statute. To attempt to cite, analyze, and discuss the cases in detail would not be particularly helpful. Most of them (down to 1927) will be found collected in an annotation in 51 A. L. R. 183, and in the earlier annotations there referred to. See, also, Wigmore on Evidence (2d Ed. and 1934 Supplement) §§ 2194, 2216, 2220, cited in our previous opinion, and the article of Mr. Blewett Lee, also there cited, in 12 A. B. A. Journal 441 (1926). For an interesting discussion on a cognate point, see State ex rel. Schlueter, etc., Co. v. Beck (Mo. Sup. 1935) 85 S. W. (2d) 1026. Without further comment upon the authorities, we state that we predicate our position in the matter upon doctrine which we believe to be fundamental and which we may summarize as follows: All judicial powers are vested in the courts (Const. S. D. art 5, § 1) and the judiciary constitutes a separate, distinct, and co-ordinate department of the government of the sovereign state (Const. S. D. art 2).

The primary function of the judiciary is the administration of justice, and justice can never be rightly administered unless truth be first ascertained as nearly as may be. See Brewer, J., dissenting, in Union Pac. Ry. Co., v. Botsford (1891) 141 U. S. 250, 11 S. Ct. 1000, 35 L. Ed. 734. The citizen holds his citizenship subject to the duty to furnish to the courts, from time to time and within reasonable limits (which are for the courts to determine), such assistance as the courts may demand of him in their efforts to ascertain truth in controversies before them. This is just as much a part of the citizen's inescapable duty of supporting his government as is military service in time of war, or any other like obligation. We perceive no valid reason why courts of record may not require of any person within their jurisdiction the furnishing of a few drops of blood for test purposes when, in the opinion of the court, so to do will or may materially assist in administering justice in a pending matter. We perceive no reason

why this is not just as proper, and just as justifialble, as it is for the same court to require the same person to attend in court for days upon end as a witness; to bring in his books, documents, and papers; and even to abide in jail unless he can satisfy the court that he will be present as a witness when desired. The order for such test should be adequately safeguarded of course, which can easily be done, as well pointed out in Hayt v. Brewster, Gordon & 'Co., supra; and it should issue not as a matter of absolute right, but in the sound discretion of the court, which discretion may be reviewed if it is abused in either direction. Indeed we might even go further. As has been often said, a trial judge should not be a mere umpire presiding over a game of skill conducted by counsel. It is difficult to see any reason why a trial judge might not of his own motion in a given case, if he thought it likely to be helpful, order the making of a blood test by a competent person and a report thereon under oath subject to cross-examination by both parties. For an instance where the court, apparently of its own motion, made submission to physical examination a prerequisite to further proceedings, see the Anonymous Case reported (1889) in 89 Ala. 291, 7 So. 100, 7 L. R. A. 425, 18 Am. St. Rep. 116. For language more or less directly pertinent to various phases of the doctrine we have above stated, see Alabama, etc., R. R. Co. v. Hill (1890) 90 Ala. 71, 8 So. 90, 9 L. R. A. 442, 24 Am. St. Rep. 764; State v. Pucca (1902) 4 Pennewill (20 Del.) 71, 55 A. 831; Crosby v. Potts (1910) 8 Ga. App. 463, 69 S. E. 582; Schroeder v. Chicago, R. I. & P. R. Co. (1877) 47 Iowa 375; S. S. Kresge Co. v. Trester (1931) 123 Ohio St. 383, 175 N. E. 611.

We recapitulate the views hereinbefore set forth by saying that we think (1) the reliability of the blood test is universally conceded by competent scientific authorities; (2) a trial court of record in this state has inherent power and authority, in its reviewable discretion, to order the taking of blood for such purposes in cases where paternity is an issue and where, in the opinion of the court, the making and reporting of such test will be, or is likely to be, helpful in ascertaining the truth. We express no opinion at this time as to whether the courts may require a defendant in a criminal case to submit to a blood test or to furnish blood for that purpose.

■ Notwithstanding these views, however, we continue to believe that we were right in our former ruling to the effect that the trial court did not err in refusing to make the order requested. We are not at liberty to reverse this case upon the sole consideration of the opinion which we happen in fact to entertain upon the abstract questions hereinbefore discussed and stated. It is our proper function and duty, as an appellate court, to affirm the judgment appealed from, unless we are satisfied that the record as presented in the particular case exhibits reversible error in the court below.

■ ■ This case was tried in October, 1931. As will be noted from the citations earlier set forth, the literature of the topic of the scientific reliability of the blood test (at least the body of such literature available in the English language) is, for the most part, subsequent to that date. We are far from willing to say that it was error for a trial judge in South Dakota, at the time of the trial of this case, to fail or refuse to take judicial notice of such reliability, notwithstanding the fact that by the assistance of able counsel, and from our own subsequent investigations, we have arrived at a complete belief in such reliability. If such reliability was not, at the time of the trial of this case, a matter which the trial court was obligated judicially to notice, then it was necessary for the applicant for the order to prove such reliability by proper and satisfactory expert testimony. Only one witness was called to the point, and his testimony in regard thereto was vague, indefinite, and unconvincing. We are equally unwilling to say that the learned trial judge erred in failing or refusing to accept such testimony as a sufficient basis for the making of the requested order. In other words, the reliability of the test (conceding our own present conviction that such reliability does exist as a matter of scientific fact) "does not sufficiently appear from the record in this case," which is the precise point upon which we sought to base our previous opinion, as hereinbefore pointed out.

Furthermore, we do not think the application was timely made. The application for the order was made and the matter was first brought to the attention of the trial court on the afternoon of the day before the taking of the testimony closed, at a time when it might well have been difficult, if not impossible (unless by virtue

of a continuance), for the state to secure competent, experienced experts to participate in or be present at the making of the tests or to check them in its behalf. Appellant was arrested in May, 1931, and was at once released on bail. He continued at liberty up to the time of the trial, and was represented by able and competent counsel at all times after his arrest. The record presents no justification for the delay in making this application to the court. The situation is analogous to the making of a motion to suppress or return evidence, which must be timely. It is doubtless true that if the trial court, in the exercise of its discretion, had granted the order, notwithstanding the lateness of the application (allowing the state a continuance, if necessary), so doing would not have constituted error; but in the converse case it seems clear that the lateness of the application is sufficient, standing alone, to prevent the refusal of the order from constituting error on appeal.

In addition, there was in the instant case no adequate showing that if the requested order was granted defendant could and would have the tests made by a competent, capable, and experienced person. The making of these tests (particularly those for agglutinogens M and N, which are not agglutinated by any substances found in the human blood, and consequently require that the testing sera must be obtained by immunizing animals) is an appreciably more difficult and complicated matter and requires much more skillful technique than the mere matching of blood for the purposes of transfusion. For detail in this connection, see Doctor Wiener's book "Blood Groups and Blood Transfusion," cited supra. As pointed out by Professor Lattes ("Individuality of the Blood," cited supra, p. 254), "* * * there is a great danger of these delicate investigations being handed over to incompetent workers; this is dangerous, not only from the point of view of justice, but it also threatens the reputation of science. Whenever this risk is present, it is better to abstain."

The record before us embraces no satisfactory showing that the medical practitioners whom defendant proposed should make the tests were experienced in so doing or were competent technicians for the purpose.

For all of these reasons, and notwithstanding our views on the abstract questions first herein discussed, we continue to be of

the opinion that the learned trial judge did not err upon the record in this case by refusing to make the requested order, and we therefore adhere to the view that the judgment and order appealed from should be affirmed (Judge Polley continuing to believe, however, that misconduct of the prosecuting attorney in another and entirely different connection should work a reversal, as he set forth at some length in his dissenting opinion when the case was previously before us.)

All the Judges concur.