STATE OF NORTH CAROLINA v. RICHIE "RICKY" LEE FOWLER

No. 37

(Filed 18 November 1970)

1. Bastards §§ 1, 6— bastardy prosecution — death of child — denial of blood grouping test

In a bastardy prosecution, the fact that the death of the child deprived the putative father of his statutory right to a blood grouping test does not warrant dismissal of the prosecution. G.S. 49-2; G.S. 49-7.

2. Bastards §§ 4, 6— blood grouping test results — consideration by jury

Blood grouping test results are not conslusive, but they should be considered by the jury along with all the other evidence in determining the issue of defendant's paternity. G.S. 8-50.1; G.S. 49-7.

3. Bastards § 1— bastardy prosecution — effect of child's death

The death of the child does not abate or prevent a prosecution against the father of an illegitimate child for his wilful failure to support and maintain the child prior to its death.

4. Criminal Law § 1— what constitutes a crime — time of determination

Whether an act, or a wilful failure to act, constitutes a crime is determined as of the time the act is committed or omitted.

5. Bastards § 9; Criminal Law § 177— remand of judgment

In a bastardy prosecution, judgment which required the convicted defendant to pay $2,857.49 to the mother for unpaid hospital and doctor expenses resulting from the illness of the illegitimate child is remanded with direction that the money be paid directly to the doctors and hospitals entitled to receive it. G.S. 49-8.

APPEAL by defendant under G.S. 7A-30(2) from the decision of the Court of Appeals (9 N.C. App. 64) finding no error in the trial conducted by *Falls, J.,* 2 March 1970 Criminal Session of GASTON.

Prosecution under G.S. 49-2. On 19 September 1969 the District Court of Gaston County issued a warrant charging defendant with the willful failure to support his illegitimate child, Michael Wayne Hicks, born to Patricia Ann Hicks on 7 September 1969. He was tried and convicted on 17 February 1970. From the judgment imposed, he appealed to the Superior Court. There, the State's evidence tended to show the following facts.

In December 1968 Patricia Ann Hicks (aged 17) became pregnant as a result of her association with defendant, with whom she had been "going steady" since November. She informed defendant of her condition in March 1969, and soon thereafter he terminated their association. On 7 September 1969 Patricia gave birth to a son, Michael Wayne Hicks. When the child was 12 days old she informed defendant it was sick and that she needed financial assistance for its support and medical bills. Defendant, although gainfully employed, refused to provide any support or financial assistance. In consequence, she instituted this prosecution. Three days later, the baby was taken to Duke Hospital. There, after open-heart surgery, it

State v. Fowler

died on 15 October 1969. Defendant went to Duke Hospital to discuss with Patricia the disposition of the body. He instructed her to have the body cremated because he could not afford a funeral, and this was done. The medical expenses incident to the birth of the baby, its subsequent operation and treatment, totaled $2,857.49.

When the case was called for trial in the Superior Court on 9 March 1970, defendant filed a written motion requesting a blood-grouping test pursuant to G.S. 49-7. In the motion he recited the death of the child on 15 October 1969 and its subsequent cremation. Then, arguing that the death of the child denied him the "safeguards" of the blood test and that a trial without it would deprive him of due process of law, he moved that the prosecution be dismissed. Judge Falls denied the motion, and the trial proceeded. The State offered the evidence detailed above; defendant offered no evidence.

In conformity with the practice in prosecutions under G.S. 49-2, three written issues were submitted to the jury. Defendant stipulated that he had refused to support the child and to pay the medical bills and that, if the jury should answer the issue of paternity against him, it would also answer the issues of willful failure to support and guilt against him. The jury, answering all issues against defendant, returned a verdict, "guilty as charged in the warrant." The court imposed a prison sentence of six months, which was suspended for five years upon condition (1) that defendant pay the costs immediately; and (2) that he pay into the office of the Clerk of the Superior Court for the use and benefit of Patricia Ann Hicks the sum of $2,857.49, payment to be made at the rate of $25.00 a week, beginning 13 March 1970.

Defendant appealed to the Court of Appeals. In a decision by Judges Hedrick and Brock, Judge Britt dissenting, that Court found no error in his trial. Because of the dissent, defendant appeals as a matter of right to this Court.

*Robert Morgan, Attorney General; Ernest L. Evans and Edward L. Eatman, Staff Attorneys for the State.*

*Richard A. Cohan for defendant appellant.*

SHARP, Justice.

[1] This appeal poses the question whether a defendant, charged under G.S. 49-2 with the willful failure to support an illegitimate child, is entitled to have the prosecution dismissed when the death of the child makes it impossible for the court to grant his motion for a blood-grouping test.

In 1945 the legislature provided that the court before which a prosecution under G.S. 49-2 is brought, "upon motion of the defendant, shall direct and order that the defendant, the mother and the child shall submit to a blood grouping test; . . . that the results of a blood grouping test shall be admitted in evidence when offered by a duly licensed practicing physician or other duly qualified person; . . . ." G.S. 49-7. In 1949, by G.S. 8-50.1, this same right was extended to "any criminal action or proceedings in any court in which the question of paternity arises, regardless of any presumptions with respect to paternity." Such evidence was made "competent to rebut any presumptions of paternity."

The value of serological blood tests, when made and interpreted by specifically qualified technicians, using approved testing procedures and reagents of standard strength, is now generally recognized. Annot., 46 A.L.R. 2d 1000 (1956) ; 10 Am. Jur. 2d *Bastards* § 32 (1963) ; McCormick on Evidence § 178 (1954). Such tests, however, can never prove the paternity of any individual, and they cannot always exclude the possibility. Nevertheless, in a significant number of cases, they can disprove it. 149 A. M. A. J. 699 (1952) ; 108 A.M. A. J. 2138-2142 (1937), cited in *Beach v. Beach,* 72 App. D.C. 318, 114 F. 2d 479, 131 A. L. R. 804. In other words, the result of the blood test will be either "exclusion of paternity demonstrated" or "exclusion of paternity not possible." 27 Can. Bar Rev. 537, 548 (1949). It has been estimated that by tests, based upon each of three blood type classifications, A-B-O, M-N, and Rh-hr, a man falsely accused has a 50-55% chance of proving his nonpaternity. 34 Cornell L. Q. 72, 75 (1949) ; McCormick, *supra* at p. 380; 23 Wash. & Lee L. Rev. 411, 419 (1966).

The nature and effect of the blood grouping tests is succinctly stated in a well documented comment in 23 Wash. & Lee L. Rev. 411: "[T]he experts agree that the test results are conclusive only in excluding the putative father. The results might show him to have a blood type which the father of the child must have had; but this only indicates that of all the people of that blood type or group, he, as well as anyone else with

that blood type or group, *could* have been the father of the child. . . ." *Id.* at 416-417.

"Medical experts agree that blood groups never change during lifetime, and that by the laws of genetics it is indisputable that no individual can possess a blood group factor which is absent in both of his true parents. Therefore when the blood types of the mother and child are known, medical experts can determine scientifically what the blood type of the father may be and what it cannot be. The medical profession does not claim that the tests are infallible even if correctly administered, but instead admits that there are theoretical exceptions—one in approximately 50,000 to 100,000 cases. Such exceptions, however, are of little importance when it is considered that when 'tests are accurately performed there is hardly any other evidence that can approach in reliability the conclusions based on such blood tests.' *Id.* at 417-418. . . (Geneticists differ in their estimates of the frequency with which exceptions to the genetic laws occur. In 71 Harv. L. Rev. 466 (1958) it is suggested that, at the most, only one exception for every 10,000 births occurs.)

"The only areas in which the results of blood grouping tests should be open to attack are in the method of testing or in the qualifications of the persons performing the tests." *Id.* at 422. For a discussion of the sources of error in blood group testing and interpretations *see* 5 U. C. L. A. L. Rev. 629, 635 (1958); 50 Mich. L. Rev. 582, 595-596 (1952); 15 Journal of Forensic Medicine 106 (1968). For other explanations of the blood grouping tests for paternity *see:* 1 Wigmore on Evidence (3d ed., 1940 and Supp. 1964) §§ 165a, 165b; 34 Cornell L. Q. 72 (1948).

In a few cases it has been found that an infant's blood group cannot be established immediately after birth. "However, by the age of six months, an accurate determination can always be had." 50 Mich. L. Rev. 592, 596 (1952). In *Fowler v. Rizzuto,* 121 N. Y. S. 2d 666, it is said "that a blood test cannot be completely carried out" until the child is at least one month old.

[2] There can be no doubt that a defendant's right to a blood test is a substantial right and that, upon defendant's motion, the court must order the test when it is possible to do so. However, as Professor Stansbury has pointed out, both G.S. 49-7 and G.S. 8-50.1 are silent as to the weight to be given to the

blood tests. Stansbury, N. C. Evidence (2d Ed., 1963) § 86 n. 7. *See* 33 N. C. L. Rev. 360 n. 15 (1955); 27 N. C. L. Rev. 456-457 (1949). Since the statutes do not make the test which establishes nonpaternity conclusive of that issue but merely provide that the results of such test "when offered by a . . . duly qualified person" shall be admitted in evidence, it seems clear that the legislative intent was that the jury should consider the test results, whatever they might show, along with all the other evidence in determining the issue of paternity. *Jordan v. Davis*, 143 Me. 185, 57 A. 2d 209, *Berry v. Chaplin*, 71 Cal. App. 2d 652, 169 P. 2d 442. *See* McCormick, *supra* at pp. 382-383; Annot., 46 A. L. R. 2d 1000, §§ 12-16 (1956); 10 Am. Jur. 2d *Bastards* § 32 (1963). *See also* the dissenting opinion in *Houghton v. Houghton*, 179 Neb. 275, 137 N.W. 2d 861, 872; and 9 U. L. A. 110-114, Uniform Act on Blood Tests to Determine Paternity.

**[3, 4]** There is nothing in N. C. Gen. Stats., Ch. 49, Art. I, which requires the continued life of the child as the basis for a prosecution under G.S. 49-2. The death of the child does not abate or prevent a prosecution against the father of an illegitimate for his willful failure to support and maintain the child prior to its death. *See State v. Beatty*, 66 N.C. 648. Whether an act, or a willful failure to act, constitutes a crime is determined as of the time the act is committed or omitted. "[T]he status of an act as a crime is fixed when it is once completed, and that status cannot be changed by the subsequent act of the criminal or of third persons. . . ." 22 C.J.S. *Criminal Law* § 41 (1961). Thus, if defendant was the father of Michael Wayne Hicks, the child's death did not make his willful failure to support it during its lifetime any less criminal or take away the State's right to punish his crime.

**[1]** To hold that a prosecution under G.S. 49-2 must be dismissed when the death of the child deprives the defendant of a blood test would be to attach to the test a significance which the legislature failed to give it. Even when a blood grouping test demonstrates nonpaternity our law does not make the test conclusive of that issue. A *fortiori*, the absence of a test, which —if made—would provide one falsely accused only an even chance to prove his nonpaternity, should not result in a dismissal of the action. When the death of the child makes a blood test impossible the situation is analogous to that which occurs when an eyewitness to events constituting the basis for an indictment dies before the accused has interviewed him or taken

his deposition. It would hardly be suggested that to try the defendant after the death of that witness would deprive him of due process and that therefore the prosecution must be dismissed.

Our research, and that of defendant, has discovered only one case involving facts similar to those with which we now deal. In *Burton v. Thompson*, 147 Me. 299, 87 A. 2d 114, the respondent in a bastardy proceeding moved for a blood grouping test. Under the applicable Maine statute, the respondent was entitled to the test, the result of which was admissible in evidence only if it excluded the possibility of paternity. The complainant's child had lived only 12 hours after birth. The respondent's request was "submitted to the law court for ruling and opinion as to any and all questions of law involved." The Supreme Judicial Court of Maine dismissed the case because it was apparent that "final disposition" of it did not turn upon the allowance or denial of the motion, and the rule was that the law court would not decide prematurely interlocutory questions which subsequent proceedings might show to be wholly immaterial. However, the court concluded its opinion by saying: "Although no decision is appropriate under the rules stated, we do not hesitate to point out that 'child' under the blood grouping test statute means a living person. Could a dead child be ordered to submit to the test? We think not." We concur in this obvious good sense.

Although not the basis for our decision in this case, we note that open-heart surgery, which requires blood transfusions, would never be performed unless the patient's blood type had been established. We have no doubt that the records of Duke Hospital contain all the information about the blood of Michael Wayne Hicks which could be obtained by testing the blood of a month-old baby. Although this information was accessible to defendant, the record discloses no effort by him to obtain it.

[5] We hold that the trial court rightly denied defendant's motion to dismiss the action. The case, however, must be remanded to the Superior Court for a modification of condition (2) of the judgment which requires defendant to pay the sum of $2,857.49 to Patricia Ann Hicks. The record discloses that amount to be the total of the following bills incident to the birth and subsequent medical treatment of Michael Wayne Hicks: Garrison Hospital of Gastonia $249.50; Drs. Chambers and Marder $15.00; Gaston Memorial Hospital $19.87; Duke

Medical Center $596.50; Duke Hospital $1,976.62. The record also discloses that at the time of the trial these bills had not been paid. On the oral argument we ascertained that they were still unpaid. G.S. 49-8 does not contemplate that money paid into court to discharge past due obligations such as these should be paid to a person to whom it was not due. When, without compensation, doctors and hospitals have performed immediately necessary services incident to the birth of a child and its subsequent welfare, public policy and simple justice require that money paid into court for them be disbursed directly to them. In no other way can their interests be protected.

This cause is returned to the Court of Appeals for remand to the Superior Court with directions that it amend condition (2) of its judgment so that the money which defendant is ordered to pay into the office of the Clerk of the Superior Court shall be disbursed to the doctors and hospitals entitled to receive it.

Modified and affirmed.