State v. Camp

STATE OF NORTH CAROLINA v. SAMUEL LEE CAMP

No. 7427SC384

(Filed 19 June 1974)

Bastards § 7; Criminal Law §§ 31, 55— blood grouping tests — judicial notice of laws of genetics — paternity — exclusion of defendant — peremptory instructions

In a prosecution for failure to support an illegitimate child wherein defendant presented testimony by a physician that he had

tested the blood of defendant, the mother and the child, and that both defendant and the mother were of blood group O while the child was of blood group A, the trial court should have taken judicial notice that under the laws of genetics and heredity a man and woman of blood group O cannot have a child of group A and should have so instructed the jury, and the court should have also instructed the jury that it would be their duty to return a verdict of not guilty if they believed the testimony of the physician and believed that the blood grouping tests were properly administered.

APPEAL by defendant from *Friday, Judge,* 29 October 1973 Session of Superior Court held in GASTON County.

Heard in the Court of Appeals 8 May 1974.

Defendant was charged with failure to support his illegitimate child. He was convicted in the District Court and appealed to the Superior Court for a trial de novo. At the trial in Superior Court, Mary Louise Hames was the only witness for the State. She testified that she was the mother of Timothy Taneau Hames, who was born on 12 July 1973. She became pregnant in October 1972. During that month she had sexual intercourse with defendant two or three times a week, and she did not have intercourse with any other man. After the child was born, she asked defendant to support it. He refused to do so and denied that he was the child's father.

Dr. Eugene Dell Rutland, Jr., a physician, was the only witness for defendant. He testified that he had tested the blood of Mary Louise Hames, Timothy Taneau Hames and defendant. The blood tests revealed that both Miss Hames and defendant were of blood group O, while the child was of blood group A. Under the laws of heredity two parents of group O cannot have a child of group A.

The jury found defendant guilty, and he was sentenced to six months' imprisonment, suspended on condition that he pay $15.00 per week for the support of the child, plus $620.00 for expenses already incurred. Defendant appealed to this Court.

*Attorney General Robert Morgan, by Deputy Attorney General Jean A. Benoy, for the State.*

*Atkins & Layton, by Nicholas Street, for defendant appellant.*

BALEY, Judge.

The issue presented by this case is: May the courts take judicial notice of the principles of heredity upon which blood tests for paternity are based? Our answer is yes. The trial court in this case should have taken judicial notice that two parents of blood group O cannot have a child of blood group A, and the jury should have been so instructed.

"There are many facts of which the court may take judicial notice, and they should take notice of whatever is, or ought to be, generally known within the limits of their jurisdiction, for justice does not require that courts profess to be more ignorant than the rest of mankind." *State v. Vick,* 213 N.C. 235, 238, 195 S.E. 779, 780-81; *see* McCormick, Evidence 2d, §§ 328-30; 1 Stansbury, N. C. Evidence (Brandis rev.), §§ 11, 14. Courts frequently take notice of scientific facts and principles. *E.g., State v. Key,* 248 N.C. 246, 102 S.E. 2d 844; *Kennedy v. Parrott,* 243 N.C. 355, 90 S.E. 2d 754; *Ingold v. Light Co.,* 11 N.C. App. 253, 181 S.E. 2d 173. "A judge of court may take judicial notice of any fact in the field of any particular science which is either so notoriously true as not to be the subject of reasonable dispute or is capable of demonstration by resort to readily accessible sources of indisputable accuracy." *Kennedy v. Parrott, supra* at 358, 90 S.E. 2d at 756.

Blood tests for paternity are based on the laws of genetics. The theory behind them may be summarized as follows:

"A blood-grouping test involves examining an individual's red blood cells to determine if either or both of two substances known as agglutinogen A and agglutinogen B are present. The individual's blood group is described accordingly: if both substances are present, the blood group is classified as group AB; if neither is present, the blood is classified as group O; and if only agglutinogen A or agglutinogen B is present, the blood group is A or B respectively.

"Blood groups have three important qualities which enable certain conclusions to be drawn about the identity of a child's parents. The first is that the blood group of a person can be determined at birth or very shortly thereafter. In addition, an individual's blood group remains constant throughout life, unaffected by age, disease or medication. Perhaps more importantly, a child inherits his blood

---

---

group from his parents in accordance with certain known laws of genetics. By these laws, if a particular agglutinogen does not appear in the red blood cells of either the mother or father, it cannot appear in the red blood cells of the child. Also, a parent with group AB blood cannot have a child with group O blood (regardless of the blood group of the other parent), nor can a parent with group O blood have a child with group AB blood."

Note, *Family Law—Blood-Grouping Tests and the Presumption of Legitimacy*, 50 N.C.L. Rev. 163, 165. For more extended discussion, see McCormick, *supra*, § 211, at 518-20; 1 Wigmore, Evidence 3d, §§ 165a-b; Comment, *Evidence—The Use of Blood Grouping Tests in Disputed Parentage Proceedings—A Scientific Basis for Discussion*, 50 Mich. L. Rev. 582. In the present case, agglutinogen A was present in the blood of Timothy Taneau Hames, but it was not present in his mother's blood or in defendant's blood. Therefore, defendant could not be the father of the child.

The reliability of blood grouping tests, and the validity of the scientific principles which underlie them, are generally accepted among scientists. As stated in Schatkin, *Law and Science in Collision: Use of Blood Tests in Paternity Suits*, 32 Va. L. Rev. 886, 890:

> "[B]lood tests are accurate, reliable and certain, and when they result in exclusion, they provide us with incontrovertible and inexorable proof of the defendant's non-paternity."

Comment, *Conclusiveness of Blood Tests in Paternity Suits*, 22 Md. L. Rev. 333, 338, states:

> "Even the most conservative discussions of the development of blood testing emphasize its almost absolute accuracy, at least where exclusion is found. While there remains the possibility that, in a given case, mutation may occur to cause an apparent exception to the Mendelian laws of inheritance, statistical studies would seem to reduce this possibility to an infinitesimal chance."

Case Comment. *Blood Grouping Test Results: Evidential Fact or Conclusion of Law?*, 23 Wash. & Lee L. Rev. 411, 417-18:

> "The medical profession does not claim that the tests are infallible . . . but instead admits there are theoretical

State v. Camp

exceptions—one in approximately 50,000 to 100,000 cases. Such exceptions, however, are of little importance when it is considered that when 'tests are accurately performed there is hardly any other evidence that can approach in reliability the conclusions based on such blood tests.' By considering the results of all of the tests which are readily performable, the probabilities are one in one hundred billion that such an exception will occur."

Note, *Children Born in Wedlock: Blood Tests and the Presumption of Legitimacy in Missouri,* 39 U.M.K.C.L. Rev. 121, 125-26:

"Not only are the medical experts in agreement about the reliability of blood tests in determining paternity, but also, their reliability has been remarkably verified in both Europe and the United States. For example, during a ten year period of tests in affiliation cases before the Court of Special Sessions in New York City 65 exclusions resulted from 656 blood tests and 100% of the exclusions were followed by the mother's first confession of sexual relations with a man other than the alleged father during the conception period. Similar verification has been found in the Children's Court of the City of Buffalo, New York. In Europe, where blood test exclusions are regarded as conclusive proof of nonpaternity, the exclusions are 'almost invariably followed by the mother's belated confessions . . . .' The biological certainty of over 99.99% found in the ABO exclusion . . . and the verification found in courts where it has been used, makes it one of the most reliable methods of proof available to the courts."

In addition, *see* Ross, *The Value of Blood Tests as Evidence in Paternity Cases,* 71 Harv. L. Rev. 466; Whitlatch & Marsters, *Contributions of Blood Tests in 734 Disputed Paternity Cases: Acceptance by the Law of Blood Tests as Scientific Evidence,* 14 West. Res. L. Rev. 115.

Many courts have recognized the accuracy of blood grouping tests. In *State v. Damm,* 64 S.D. 309, 312, 266 N.W. 667, 668 (1936), the court held:

"[I]t is our considered opinion that the reliability of the blood test is definitely, and indeed unanimously, established as a matter of expert scientific opinion entertained by authorities in the field . . . . "

*Clark v. Rysedorph,* 281 App. Div. 121, 123, 124, 118 N.Y.S. 2d 103, 104, 106 (1952).

> "The principle underlying blood tests is that certain characteristics or properties of the blood of a parent perpetuate themselves in that of his or her offspring in accordance with the Mendelian Law, and that the results of such tests are relevant in the determination of whether a given child is the offspring of a specified adult or whether a given adult is the mother or father of a particular child. . . . To reject such testimony is to ignore scientific facts. This we may not do."

*Anonymous v. Anonymous,* 10 Ariz. App. 496, 498, 499, 460 P. 2d 32, 34, 35 (1969) :

> "Both the existence of various blood types and Mendel's Law of Hereditary Characteristics are universally [*sic*] accepted in scientific fields." To allow a jury to ignore them "would be tantamount to this court, by judicial decree, declaring the laws of motion and gravity to be repealed."

*Cortese v. Cortese,* 10 N.J. Super. 152, 156, 157, 76 A. 2d 717, 719, 720 (1950) (Brennan, J.) :

> "The value of blood tests as a wholesome aid in the quest for truth in the administration of justice . . . cannot be gainsaid in this day. Their reliability as an indicator of the truth has been fully established. . . . It is plain we should hold, as we do, that this unanimity of respected authorities justifies our taking judicial notice of the general recognition of the accuracy and value of the tests when properly performed by persons skilled in giving them. The law does not hesitate to adopt scientific aids to the discovery of truth which have achieved such recognition."

*Commonwealth v. D'Avella,* 339 Mass. 642, 645-46, 162 N.E. 2d 19, 21 (1959) :

> "The reliability of such tests to prove nonpaternity is well established as a scientific fact. Evidence which is regarded and acted upon every day as conclusive by skilled scientists outside of court ought not to be treated merely as some evidence (to be believed or disbelieved as the trier of fact sees fit) when it is adduced in court. We cannot close our eyes to the overwhelming weight of scientific

opinion on this subject and we take judicial notice of it. . . . When science acquires knowledge whereby the ascertainment of truth in these cases is certain, courts ought not to ignore such knowledge; on the contrary they should welcome it."

In *Wright v. Wright,* 281 N.C. 159, 172, 188 S.E. 2d 317, 326, the Supreme Court of North Carolina stated:

"Blood-grouping tests which show that a man cannot be the father of a child are perhaps the most dependable evidence we have known."

Since the accuracy of the blood test is universally accepted, the courts should take judicial notice of it. The courts of New Jersey and Massachusetts did so in the *Cortese* and *D'Avella* cases quoted above. In addition, the Supreme Court of Nebraska judicially noticed the test's validity in *Houghton v. Houghton,* 179 Neb. 275, 137 N.W. 2d 861 (1965). Other courts have set aside jury verdicts that were in conflict with blood test results, or even treated the test results as conclusive. *Retzer v. Retzer,* 161 A. 2d 469 (D.C. Mun. Ct. App. 1960) ; *Jordan v. Mace,* 144 Me. 351, 69 A. 2d 670 (1949) ; *Anonymous v. Anonymous,* 1 App. Div. 2d 312, 150 N.Y.S. 2d 344 (1956) ; *Clark v. Rysedorph, supra; Rose v. Rose,* 16 Ohio App. 2d 123, 242 N.E. 2d 677 (1968) ; *Commonwealth v. Coyle,* 190 Pa. Super. 509, 154 A. 2d 412 (1959). The contrary view, the view that the jury may freely accept or reject the blood test results, "is dying out." McCormick, *supra,* § 211, at 521 n. 95.

The State contends that under *State v. Fowler,* 277 N.C. 305, 177 S.E. 2d 385, the jury must be left entirely free to accept or reject the blood test evidence as it chooses. In making this contention, the State misinterprets the *Fowler* case. In *Fowler* the Supreme Court held that blood test results cannot be regarded as conclusive. *Id.* at 310, 177 S.E. 2d at 387. This decision was eminently correct, for two reasons. First, a blood test is of no value unless it is properly administered. If the doctor conducting the tests does not follow the correct procedures, an incorrect result may be obtained. *See Anonymous v. Anonymous,* 10 Ariz. App. 496, 460 P. 2d 32 (1969) ; Littell & Sturgeon, *Defects in Discovery and Testing Procedures: Two Problems in the Medicolegal Application of Blood Grouping Tests,* 5 U.C.L.A.L. Rev. 629. Second, it is always possible that blood test results may be falsely reported. In every case the jury has the right to find

that a witness is lying and refuse to believe his testimony. *See Cutts v. Casey*, 278 N.C. 390, 180 S.E. 2d 297. For these two reasons, it would be unjust to treat blood test evidence as conclusive. But it would be even more unjust to give the jury unlimited freedom to accept or reject at whim the results of a properly conducted blood test; and the *Fowler* case does not require such an unjust result. Indeed, the *Fowler* opinion expressly states: " 'The only areas in which the results of blood grouping tests should be open to attack are in the method of testing or in the qualifications of the persons performing the tests.' " 277 N.C. at 309, 177 S.E. 2d at 387.

In the present case the trial judge instructed the jury as follows: "Now, for the defendant, members of the jury, you will recall that Dr. Eugene D. Rutland took the stand as a witness. . . . He said that in his opinion a male and female with group 'O' cannot produce an infant with group 'A' blood." The court thus treated a scientific principle as the opinion of a single doctor. Faced with the choice between the unequivocal testimony of Miss Hames and the personal opinion of a single doctor, the jury not surprisingly accepted the mother's testimony and found defendant guilty. The instructions given by the court constitute prejudicial error.

The court should have taken judicial notice that a man and woman of blood group O cannot have a child of group A. The jury should have been instructed to the effect that under the laws of genetics and heredity a man and woman of blood group O cannot possibly have a child of blood group A and that if they believed the testimony of the doctor and believed that the tests were properly administered, it would be their duty to return a verdict of not guilty.

For error in the charge, defendant is entitled to a new trial.

New trial.

Chief Judge BROCK and Judge PARKER concur.