STATE OF NORTH CAROLINA v. SAMUEL LEE CAMP

No. 73

(Filed 26 November 1974)

1. **Bastards § 5— blood grouping tests — right of defendant to demand — admissibility of results**

 In N. C., when paternity is in issue, statutes require that upon motion by defendant the court order blood tests for mother, child and alleged father and that results of such tests be admitted in evidence when offered by a duly licensed practicing physician or other qualified person. G.S. 49-7; G.S. 8-50.1.

2. **Statutes § 5— clear and unambiguous language — prohibition against judicial construction**

 It is a well-settled principle of statutory construction that where a statute is intelligible without any additional words, no additional words may be added, and where the language of the statute is clear

and unambiguous, there is no room for judicial construction, but the courts must give it its plain and definite meaning and they are without power to interpolate, or superimpose, provisions and limitations not contained therein.

**3. Bastards § 4— blood grouping tests — results not conclusive on paternity issue**

Since G.S. 49-7 and G.S. 8-50.1 are silent as to the weight to be given to blood tests and do not make the test which establishes nonpaternity conclusive of that issue but merely provide that results of the test may be admitted in evidence, it seems clear that the legislative intent was that the jury should consider the test results, whatever they might show, along with all the other evidence in determining the issue of paternity.

Chief Justice BOBBITT not sitting.

Justice HUSKINS dissenting.

Justice HIGGINS joins in dissenting opinion.

ON *certiorari* to review the decision of the North Carolina Court of Appeals, reported in 22 N.C. App. 109, 205 S.E. 2d 800 (1974), finding error in the trial before *Friday, J.,* at the 29 October 1973 Session of GASTON Superior Court.

Defendant was tried and convicted of wilfully neglecting or refusing to support his minor illegitimate child, a violation of G.S. 49-2. From a six months' prison sentence, suspended on condition, among others, that he support the child, defendant appealed to the Court of Appeals. That court found error in the trial judge's charge to the jury and ordered a new trial. We allowed the State's petition for *certiorari* on 30 August 1974.

The only witness for the State was the mother, Mary Louise Hames, who testified that she was unmarried; that the child, Timothy Taneau Hames, was conceived in October 1972, was born 12 July 1973, and was a full-term baby; and that she had sexual intercourse with the defendant a number of times in October and November 1972 and with no one else.

The only witness for the defendant was Dr. Eugene Dell Rutland, Jr. He testified that he made blood tests involving the defendant, the mother of the child, and the child on three separate days—September 28, 1973, September 29, 1973, and October 3, 1973. He testified further that the mother's blood was in group "O," the defendant's was in group "O," and the baby's was in group "A." He then testified that from his study of medicine he had an opinion satisfactory to himself that the

defendant could not be the father of the child, for the reason that a male and female with group "O" blood cannot produce an infant with a group "A" blood.

Judge Friday charged the jury in part as follows:

> "Now, ladies and gentlemen, in connection with blood-grouping tests, the Court instructs you that our law here in the State of North Carolina says that blood-grouping tests are not conclusive on the issue of paternity. This same law further says that the jury shall consider the tests results, whatever they may show, along with all other evidence, in determining the issue of paternity, that is, in determining who is the father of the child, Timothy Hames."

The Court of Appeals ordered a new trial.

*Attorney General James H. Carson, Jr., Deputy Attorney General Jean A. Benoy, and Associate Attorney Noel Lee Allen for the State, appellant.*

*Nicholas Street for defendant appellee.*

MOORE, Justice.

The sole question presented by this appeal is the weight to be given a properly administered blood test that shows nonpaternity. The trial court instructed the jury that blood tests are not conclusive on the issue of nonpaternity but that the results of such tests are to be considered along with all the other evidence in determining the issue of paternity. The Court of Appeals awarded a new trial, saying that the instruction as given was erroneous, and that the court should have charged that under the law of genetics and heredity a man and woman of blood group "O" cannot possibly have a child of blood group "A," and that if they believed the testimony of the doctor and believed that the tests were properly administered, it would be their duty to return a verdict of not guilty.

Cases from other jurisdictions involving the question before us are collected in Annot., 46 A.L.R. 2d 1000 (1956). The positions taken by other courts are summarized by the Supreme Court of Nebraska in *Houghton v. Houghton,* 179 Neb. 275, 285-86, 137 N.W. 2d 861, 869 (1965):

> "In cases arising either under . . . statutes or by courts which have taken judicial notice of the reliability of such

tests, the courts are not in harmony as to the weight to be given to such evidence. . . . Some cases have held that blood tests indicating nonpaternity are only entitled to the same weight as other evidence. Among them are *Arais v. Kalensnikoff,* 10 Cal. 2d 428, 74 P. 2d 1043, 115 A.L.R. 163; *Berry v. Chaplin,* 74 Cal. App. 2d 652, 169 P. 2d 442; and *Ross v. Marx,* 24 N. J. Super. 25, 93 A. 2d 597. The reasoning of the courts holding this view is stated in *Arais v. Kalensnikoff, supra,* as follows: 'Expert testimony "is to be given the weight to which it appears in each case to be justly entitled." * * * "When there is a conflict between scientific testimony and testimony as to the facts, the jury or trial court must determine the relative weight of the evidence. . . . " '

"The courts of other jurisdictions, while holding the results obtained from tests are not conclusive on the issue of nonpaternity, do hold that such tests should be given great weight. See, *Commonwealth v. Gromo,* 190 Pa. Super. 519, 154 A. 2d 417; *State ex rel. Steiger v. Gray,* Ohio Jur., 145 N.E. 2d 162; *Beck v. Beck,* 153 Colo. 90, 384 P. 2d 731. . . .

"[There is] a third rule followed by some courts. . . . It is that, in the absence of evidence of a defect in the testing methods, blood grouping tests are conclusive on the issue of nonpaternity. See, *Anonymous v. Anonymous,* 1 App. Div. 2d 312, 150 N.Y.S. 2d 344; *Saks v. Saks,* 189 Misc. 667, 71 N.Y.S. 2d 797; *Jordan v. Davis,* 143 Me. 185, 57 A. 2d 209; *Commonwealth v. D'Avella,* 339 Mass. 642, 162 N.E. 2d 19; *Commonwealth v. Coyle,* 190 Pa. Super. 509, 154 A. 2d 412; *Retzer v. Retzer* (D.C. Mun. App.), 161 A. 2d 469."

[1] In North Carolina, when paternity is in issue, statutes require that upon motion by defendant the court order blood tests for mother, child and alleged father. G.S. 49-7; G.S. 8-50.1. G.S. 8-50.1 further provides that " . . . The results of such blood grouping tests shall be admitted in evidence when offered by a duly licensed practicing physician or other qualified person." Neither statute prescribes the weight to be given such evidence.

[2] It is a well-settled principle of statutory construction that where a statute is intelligible without any additional words, no additional words may be supplied. 2A Sutherland Statutory Con-

struction § 47.38 (4th ed., 1973) ; *State v. Humphries,* 210 N.C. 406, 186 S.E. 473 (1936). Here, it is clear that G.S. 49-7 and G.S. 8-50.1 allow the results of blood-grouping tests into evidence, but the statutes are silent regarding the weight to be given such results. "Where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give it its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein." 7 Strong, N. C. Index 2d, Statutes § 5 (1968). This rule was applied in *Board of Architecture v. Lee,* 264 N.C. 602, 142 S.E. 2d 643 (1965). In that case, the North Carolina Board of Architecture, pursuant to G.S. 83-12, sought to enjoin the defendant from practicing architecture without a license. An exemption to the licensing requirement provided: " . . . Nothing in this chapter shall be construed to prevent any person from making plans or data for buildings *for himself.*" (Emphasis added.) One of the buildings construction of which was sought to be enjoined was an automobile sales and service building to be located on defendant's property. Defendant had drawn the plans for the building, though he planned to lease it to others. The Board contended that "for himself" in the statute meant buildings that defendant would actually occupy. This Court disagreed. Justice Parker (later Chief Justice), speaking for the Court, said:

> " . . . It seems plain that the statutory exception contemplates possession by the designer of the building for whatever lawful purpose he may choose. If the General Assembly had intended the statutory exception to be limited to buildings actually occupied by the designer, and not for lease and use by the public, it could quite easily have said so. . . . The General Assembly having thus formally and clearly expressed its will, the Court is without power to interpolate or superimpose conditions and limitations which the statutory exception does not of itself contain."

[3]  More recently, we applied this rule to the question now before us. In *State v. Fowler,* 277 N.C. 305, 177 S.E. 2d 385 (1970), Justice Sharp, speaking for the Court, said:

> "There can be no doubt that a defendant's right to a blood test is a substantial right and that, upon defendant's motion, the court must order the test when it is possible to do so. However, as Professor Stansbury has pointed out, both G.S. 49-7 and G.S. 8-50.1 are silent as to the weight

State v. Camp

to be given to the blood tests. Stansbury, N. C. Evidence (2d Ed., 1963) § 86 n. 7. *See*, 33 N.C. L. Rev. 360 n. 15 (1955) ; 27 N.C. L. Rev. 456-457 (1949). Since the statutes do not make the test which establishes nonpaternity conclusive of that issue but merely provide that the results of such test 'when offered by a . . . duly qualified person' shall be admitted in evidence, it seems clear that the legislative intent was that the jury should consider the test results, whatever they might show, along with all the other evidence in determining the issue of paternity. [Citations omitted.]"

The opinion of the Court of Appeals is well reasoned and documented, and cogently presents the view of many jurisdictions that blood-grouping tests that point to nonpaternity are conclusive. Indeed, this Court, recognizing the reliability of such tests, has said: " . . . Blood-grouping tests which show that a man cannot be the father of a child are perhaps the most dependable evidence we have known. See Note, 50 N.C. L. Rev. 163 (1971)." *Wright v. Wright,* 281 N.C. 159, 172, 188 S.E. 2d 317, 326 (1972). Perhaps the General Assembly should provide that the results of such tests showing nonpaternity should be conclusive. However, when public policy requires a change in a constitutionally-valid statute, it is the duty of the Legislature and not the courts to make that change. 2 Strong, N. C. Index 2d, Constitutional Law § 10 (1967) ; *Clark's v. West,* 268 N.C. 527, 151 S.E. 2d 5 (1966) ; *Insurance Co. v. Bynum,* 267 N.C. 289, 148 S.E. 2d 114 (1966) ; *Fisher v. Motor Co.,* 249 N.C. 617, 107 S.E. 2d 94 (1959). " . . . As long as [the legislative body] does not exceed its powers, the courts are not concerned with the motives, wisdom, or expediency which prompt its actions. These are not questions for the court but for the legislative branch of the government. *State v. Warren,* 252 N.C. 690, 114 S.E. 2d 660; *Ferguson v. Riddle,* 233 N.C. 54, 62 S.E. 2d 525; *State v. Harris,* 216 N.C. 746, 6 S.E. 2d 854." *Clark's v. West, supra.* "The legislative, executive, and supreme judicial powers of State government shall be forever separate and distinct from each other." Article I, section 6, North Carolina Constitution.

For the above reasons, we adhere to the interpretation of the statute as set out in *State v. Fowler, supra,* and leave to the General Assembly the question of the weight to be given such blood-grouping tests.

The cause is returned to the Court of Appeals for remand to the Superior Court with direction that the judgment entered by Judge Friday be affirmed. The decision of the Court of Appeals is reversed.

Reversed.

Chief Justice BOBBITT not sitting.

Justice HUSKINS dissenting.

The majority opinion accurately depicts the present state of the law and is unquestionably correct unless we are prepared to take judicial notice of the laws of heredity. I think we should judicially recognize these hereditary laws and my dissent is based solely on that ground.

Defendant was charged with the willful failure to support his illegitimate child. He is presumed to be innocent. To establish his guilt the State is required to prove *beyond a reasonable doubt* (1) that defendant is the father of the child and (2) that he willfully failed to support it.

The mother of the child was the only witness for the State. She testified that she was unmarried and that the child was conceived in October 1972, was a full-term baby and born on 12 July 1973. She swore that she had sexual relations with defendant two or three times a week in October and November 1972 and with no one else.

The only witness for the defendant was Dr. Eugene Dell Rutland, Jr. He testified that he tested the blood of the mother, the defendant and the child. These tests revealed that both the mother and the defendant had type O blood while the child had type A blood. Dr. Rutland then testified that in his opinion, based on the laws of genetics and heredity, two parents with type O blood cannot produce a child with type A blood.

According to Mendel's Law of Hereditary Characteristics, two parents with type O blood cannot produce a child with type A blood. The validity of this scientific principle is accepted by the medical profession and among scientists generally. The medical profession apparently admits that, theoretically, due to possible mutation of the genes, two parents with type O blood might produce a child with type A blood in one out of 50,000

to 100,000 cases. See Comment, Conclusiveness of Blood Tests in Paternity Suits, 22 Md. L. Rev. 333 (1962), and cases cited; Comment, Blood Grouping Test Results: Evidential Fact or Conclusion of Law? 23 Wash. & Lee L. Rev. 411 (1966), and cases cited. Notwithstanding this "theoretical exception," when the quantum of proof required to convict is "beyond a reasonable doubt," the possibility of error is so infinitesimal that the tests should be accepted as infallible when they exclude the defendant as the father of the child. The administration of justice is not aided by a rule of evidence, such as ours, which permits a jury in its unbridled discretion to ignore scientific facts and base its verdict on testimony which, according to Mendel's Law, is false 49,999 out of every 50,000 times!

It is my view that Mendel's Law of Hereditary Characteristics is so notoriously true as to exclude reasonable dispute and its accuracy and reliability has been demonstrated by readily accessible scientific sources of indisputable accuracy. This Court, therefore, may and should take judicial notice of the fact that two parents with type O blood cannot produce a child with type A blood. *Kennedy v. Parrott*, 243 N.C. 355, 90 S.E. 2d 754 (1956). The Court of Appeals so held and I am in full accord with the well reasoned and fully documented opinion of that court. Whether the blood tests are properly administered and whether the results of the tests are truthfully reported to the court and jury, if disputed, are jury questions. The jury should have been instructed in this case, as the Court of Appeals held, "that under the laws of genetics and heredity a man and woman of blood group O cannot possibly have a child of blood group A and that if they believed the testimony of the doctor and believed that the tests were properly administered, it would be their duty to return a verdict of not guilty."

For the reasons stated I respectfully dissent from the majority opinion which reverses the decision of the Court of Appeals and upholds the conviction of this defendant on the unsupported testimony of the mother and in the face of blood tests which, if properly administered and truthfully reported, show that defendant could not be the father of this child.

I am authorized to say that Mr. Justice HIGGINS joins in this dissent.