STATE OF NORTH CAROLINA v. KENNETH RAY BLUE

No. COA99-323

(Filed 20 June 2000)

## 1. Homicide— second-degree murder—shaken baby syndrome—malice—sufficiency of evidence

The trial court erred in denying defendant's motion to dismiss the charge of second-degree murder in a shaken baby syndrome case based on a failure to show malice, because: (1) a defendant's shaking a baby and the baby's death by shaken baby syndrome are not the sole determinants of whether the State has produced sufficient evidence of malice; (2) the evidence did not show the infant victim was shaken violently or vigorously, nor that she vomited, had bruises to the brain, suffered hemorrhaging in her lungs, or had multiple external injuries; (3) the facts do not show a particular animosity and wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind utterly regardless of social duty and deliberately bent on mischief; and (4) the evidence is sufficient only to raise a suspicion or conjecture of malice.

STATE v. BLUE

[138 N.C. App. 404 (2000)]

### 2. Criminal Law— instructions—burden of proof—correct charge—fundamental right

Although the trial court's erroneous reference in a second-degree murder case to the greater weight of the evidence in the jury instructions on circumstantial evidence appears among nearly twenty references to the correct burden of proof of guilt beyond a reasonable doubt, the Court of Appeals emphasizes that a correct charge is a fundamental right of every accused.

Appeal by defendant from judgment entered 16 December 1998 by Judge Robert P. Johnston in Gaston County Superior Court. Heard in the Court of Appeals 27 January 2000.

*Attorney General Michael F. Easley, by Assistant Attorney General Robert M. Curran, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Daniel R. Pollitt, for defendant.*

McGEE, Judge.

The State's evidence at trial tended to show that: Kenneth Ray Blue (defendant) resided in a mobile home in Gaston County with his girlfriend, Amanda Conner (Ms. Conner), their eighteen-month-old daughter, Jaylenn, and Ms. Conner's two-month-old daughter, Alexis, who had a different father. Defendant worked as a plumber's assistant while Ms. Conner supervised the children at home during the day. Ms. Conner worked at a grocery store at night, while defendant stayed home with the children. Jaylenn was a normal, healthy child, but Alexis was relatively small, underdeveloped, and weak, weighing only ten pounds. Alexis had difficulty holding her head upright, would frequently spit up her food, and was colicky.

Ms. Conner testified that on 19 February 1998 she went to work at 5:15 p.m., leaving defendant at home with the children. When she returned home shortly before 11:00 p.m., defendant was lying on the couch watching television. Defendant told Ms. Conner that Alexis had eaten and spit up before he put her to bed at 8:00 or 9:00 p.m. Ms. Conner looked at Alexis in her bassinet, saw she looked normal, and went to bed with defendant. Ms. Conner testified, "I can remember seeing her cheeks and she looked normal." After lying in bed for approximately fifteen minutes, Ms. Conner got up to turn off the television and then returned to bed. A few minutes later, Ms. Conner got up again to go to the bathroom and heard Alexis make a grunting

sound, which Ms. Conner had heard many times before and typically signaled that Alexis would awaken soon. Both times Ms. Conner got up, defendant asked her where she was going, which she said he normally did not ask. In her statement to the police, Ms. Conner described defendant as "paranoid and jumpy" when he asked where she was going.

Ms. Conner testified that defendant woke her up the next morning and told her "we're running late." Defendant had already dressed Jaylenn, which Ms. Conner said was unusual because on prior occasions defendant had insisted that Ms. Conner dress Jaylenn. Ms. Conner went to the bassinet to feed Alexis. Ms. Conner picked Alexis up and the baby felt hard and cold. Ms. Conner screamed defendant's name, and he also screamed out. He said they should call the police.

Defendant, Ms. Conner, and Jaylenn rode to a nearby convenience store to make the call because they did not have a telephone at home. Ms. Conner watched defendant make the call while she and Jaylenn sat in the car. Ms. Conner testified that as they were returning home, defendant said they had to do CPR and that "they are going to blame us for this." She told him "we didn't do nothing wrong" and that she "thought it was SIDS." They asked a neighbor to give Alexis CPR, and when the neighbor's girlfriend volunteered, defendant took her to Alexis. Ms. Conner did not enter the house because she "couldn't handle seeing [her] baby like that." The police and a rescue team arrived within five to ten minutes. As the ambulance left for the hospital, the family followed in their car. The emergency medical technicians determined that Alexis was beyond resuscitation and discontinued CPR on the way to the hospital.

Ms. Conner testified defendant asked her if she was going to request an autopsy. The police officer who responded to the call described defendant as "nervous" in that he straightened up the living room and did not pay much attention to the child. The emergency medical technician testified that defendant appeared nervous and distraught.

Dr. Peter Wittenberg, who performed an autopsy on Alexis, testified that many small blood vessels on the surface of the brain were torn and bleeding, but that larger blood vessels were not torn. Blood from the small vessels had produced a thin coating on the surface of the brain and a slight hemorrhage in the right eye. The bleeding caused increased pressure on the brain, leading to swelling and

death. According to Dr. Wittenberg, there were no other internal or external injuries to Alexis's body, and specifically her ribs were not bruised or fractured. He also indicated there were no external head injuries and the skull was not fractured. He could not pinpoint the child's time of death. Dr. Wittenberg concluded the cause of Alexis's death was "shaken baby syndrome." Dr. Wittenberg testified that he could not say how much shaking had occurred, but that the shaking could not have been light.

In his initial statement to police prior to the autopsy, defendant stated that on the previous evening he had put Alexis to bed around 9:00 p.m. and that "[e]verything was fine."

> Alexis ate. I changed her. My girlfriend got home from work around 11:00 P.M. Before I went to bed I checked on both girls. Alexis was on her back at 11:00 when I checked on her. I laid her on her stomach when I put her to bed. When I checked on Alexis at 11:00 P.M. she was asleep. She was moving around as she slept. My girlfriend and I went to bed shortly after 11:00.

Defendant made a second statement to police after the autopsy by Dr. Wittenberg showed Alexis died from shaken baby syndrome. The interview was conducted by Steve Myers, a detective with the Gaston County Police Department, and Sergeant Dean Henderson, who wrote the statement signed by defendant. Detective Myers testified that on the night before Alexis was found dead, defendant "advised he became frustrated [with Alexis's crying] and started shaking Alexis but he didn't realize that he was shaking her that hard." Detective Myers stated that defendant said he "had begun bouncing the child on his knee and he was concentrating on a TV show also that he was watching." Detective Myers also stated that defendant said that "she started crying louder and louder and he picked her up, cupped her up under the arms and chest . . . holding her up . . . barely off his leg, and that he was shaking her trying to get her to stop crying."

In response to a question from Detective Myers about whether defendant was supporting the baby's neck, defendant "stated that he might have had his fingers, his middle fingers, up on the neck." Detective Myers testified that "I did ask him could he have been shaking the baby frontwards and backwards, too, and he said that's possible." Detective Myers added that defendant said Alexis "started whimpering and [defendant] gave her a bottle, fed her three ounces of formula, and that he held her until about 8:30 or 9:00 p.m. and then

took her to the bassinet and put her in bed." The end of defendant's statement read:

> I didn't realize that me shaking her the way I did caused the damage to her. I apologize for what happened, for shaking her. I had no intention of hurting her. I feel like I must have used more force that I thought I did. I feel like I really got frustrated and really didn't realize the force I was using.

Ms. Conner testified that defendant loved both Alexis and Jaylenn equally, treated them equally, and never abused or mistreated either child. She also told police that defendant "is good to both my children and never loses his temper with them. He has not been abusive to either of my children." She said she would not have tolerated mistreatment of her children, and stated nothing unusual happened on 19 February 1998, the last day Alexis was alive. Ms. Conner also testified that doctors had advised her to position Alexis across the knee, "sort of bounce her" and "pat her butt" to stop her from crying, which normally soothed Alexis. She stated that Alexis was "real weak" and "didn't develop like most children do." Alexis was "much weaker than Jaylenn had been . . . and wasn't strong enough to hold her head up." She stated that she and defendant cooperated in the investigation and gave voluntary statements to the officers.

Defendant moved to dismiss the charge of second degree murder at the close of the State's evidence, which was denied. Defendant presented no evidence at trial. He again moved to dismiss the charge of second degree murder at the close of all evidence, which was denied by the trial court. The trial court instructed the jury on second degree murder and involuntary manslaughter. Defendant was convicted of second degree murder and sentenced to a minimum term of 125 months and a maximum term of 159 months in prison. Defendant appeals.

**[1]** Defendant first argues that his second degree murder conviction must be vacated for insufficient evidence of malice. At trial, defendant moved to dismiss the charge of second degree murder for insufficient evidence.

> It is well-settled that when considering a motion to dismiss for the insufficiency of the evidence, the trial court must examine the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from the evidence. The motion to dismiss must be denied if the evidence,

when viewed in the light most favorable to the State, permits 'a rational jury to find the existence of each element of the charged crime beyond a reasonable doubt.'

*State v. Chavis*, 134 N.C. App. 546, 553, 518 S.E.2d 241, 247 (1999) (citations omitted). "The test for appellate review of a trial court's granting [or denying] of a motion for a new trial due to insufficiency of the evidence [is] simply whether the record affirmatively demonstrates an abuse of discretion by the trial court in doing so." *In Re Buck*, 350 N.C. 621, 629, 516 S.E.2d 858, 863 (1999).

Second degree murder is the unlawful killing of a human being with malice, but without premeditation and deliberation. *State v. Foust*, 258 N.C. 453, 458, 128 S.E.2d 889, 892 (1963). Malice is an essential element of second degree murder. *State v. Lang*, 309 N.C. 512, 524, 308 S.E.2d 317, 323 (1983). Our Supreme Court has recognized three types of malice in homicide cases:

> [I]n our law of homicide there are at least three kinds of malice. One connotes a positive concept of express hatred, ill-will or spite, sometimes called actual, express, or particular malice. Another kind of malice arises when an act which is inherently dangerous to human life is done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief. Both these kinds of malice would support a conviction of murder in the second degree. There is, however, a third kind of malice which is defined as nothing more than "that condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification."

*State v. Reynolds*, 307 N.C. 184, 191, 297 S.E.2d 532, 536 (1982) (citations omitted). The State argues that the second kind of malice was present in this case, that defendant acted "with recklessness of the consequences of his actions" and in such a way as to indicate a total disregard for human life. The State does not refer to any facts from the case supporting this argument in its brief.

This kind of malice has been more specifically described by our Supreme Court in *State v. Wilkerson*, 295 N.C. 559, 247 S.E.2d 905 (1978) as "comprehend[ing] not only particular animosity 'but also wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty and deliberately bent on mischief, though there may be no intention to injure a particular person.' " *Wilkerson*, 295 N.C. at 578, 247 S.E.2d at 916. In *State*

*v. Rich*, 132 N.C. App. 440, 512 S.E.2d 441 (1999), *aff'd*, 351 N.C. 386, 527 S.E.2d 299 (2000), our Court characterized the *Wilkerson* description as a list of "examples, any one of which may provide the malice necessary to convict a defendant of second-degree murder." *Rich*, 132 N.C. App. at 446, 512 S.E.2d at 446 (upholding jury instructions permitting malice to be found if any one descriptive phrase in *Wilkerson* applied to the defendant).

On appeal to our Supreme Court, the defendant in *Rich* argued "if this Court allows the six traditional descriptive words and phrases defining malice to be read in the disjunctive, then it is possible for a jury to convict a defendant of second-degree murder based [only] on a finding of 'recklessness of consequences.' " *State v. Rich*, 351 N.C. 386, 393, 527 S.E.2d 299, 303 (2000). According to the defendant, "this would effectively lower the culpability level required to convict a defendant of second-degree murder since 'recklessness of the consequences' is a level of culpability usually associated with negligence." *Id.* Our Supreme Court in *Rich* disagreed, noting that "the distinction between 'recklessness' indicative of murder and 'recklessness' associated with manslaughter 'is one of degree rather than kind.' " *Id.* (citation omitted). The *Rich* Court stated that "[b]ecause the trial court's instructions, in their entirety, conveyed the level of recklessness required for second-degree murder, we cannot conclude that the jury could have confused such a high degree of recklessness with mere culpable negligence." *Id.*

Thus, our Supreme Court in *Rich* did not alter the traditional meaning of malice, but rather affirmed our Court's holding that any one term or phrase in the *Wilkerson* description is itself adequate to describe malice. Furthermore, the phrase "recklessness of consequences" continues to require a high degree of recklessness to prove malice, and according to *Rich*, this high degree is adequately conveyed when "recklessness of consequences" appears within the context of all the other terms and phrases comprising the *Wilkerson* description. Hence, in the case before us we describe malice with the familiar language from *Wilkerson*, keeping in mind that the terms and phrases of the description are meant to be disjunctive, yet also understanding that the phrase "recklessness of consequences" denotes the high degree of recklessness required for murder as opposed to the lesser degree required for manslaughter.

To support defendant's conviction of second degree murder, " '[s]ubstantial evidence must be introduced tending to prove the essential elements of the crime charged and that defendant was

the perpetrator.' " *State v. Elliott*, 344 N.C. 242, 266-67, 475 S.E.2d 202, 212 (1996) (citation omitted), *cert. denied*, 520 U.S. 1106, 137 L. Ed. 2d 312 (1997). Substantial evidence, as required for a denial of a motion to dismiss on the ground of insufficient evidence, is such relevant evidence as a reasonable mind might find sufficient to support a conclusion. *State v. Cozart*, 131 N.C. App. 199, 202, 505 S.E.2d 906, 909 (1998), *disc. review denied*, 350 N.C. 311, — S.E.2d — (1999).

> If, however, when the evidence is so considered it is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss must be allowed. This is true even though the suspicion aroused by the evidence is strong.

*State v. Malloy*, 309 N.C. 176, 179, 305 S.E.2d 718, 720 (1983) (citations omitted).

Our question is whether the facts taken in the light most favorable to the State constitute substantial evidence of malice on the part of defendant, or instead merely "raise a suspicion or conjecture" that defendant acted with malice. The State contends *State v. Hemphill*, 104 N.C. App. 431, 409 S.E.2d 744 (1991) supports its argument that the trial court properly found substantial evidence of malice in this case. In *Hemphill*, the defendant took his four-month-old baby to the hospital in the late afternoon, and the baby's pediatrician determined that the baby had been dead for three to four hours. The doctor performing the autopsy found significant evidence of shaken baby syndrome, including vomiting, hemorrhaging in the lungs, and bruises on the front and back of the brain. The doctor testified that the injury resulted from "violent or vigorous" shaking. In a statement to police after the autopsy was completed, the defendant stated that he had shaken the child about four times shortly before noon on the day she died because she was choking. *Hemphill*, 104 N.C. App. at 431-33, 409 S.E.2d at 744-45. After reciting these facts, defining malice, and holding that the facts were sufficient to support a finding of malice, our Court summarized that:

> The evidence that defendant shook the baby as well as the expert testimony that the cause of death was 'Shaken Baby Syndrome,' which typically results from an infant's head being held and shaken so violently that the brain is shaken inside the skull causing bruising and tearing of blood vessels on the surface of and inside the brain, is sufficient to show that defendant acted with

'recklessness of consequences, . . . though there may be no intention to injure a particular person.'

*Id.* at 434, 409 S.E.2d at 745.

Our holding in *Hemphill*, however, was based on all of the State's evidence and not solely on the two factors that the "defendant shook the baby" and "the cause of death was 'Shaken Baby Syndrome[.]' " *See id.* ("We hold the evidence in the present case is sufficient to support a finding by the jury that defendant acted with malice as defined by *Wilkerson*."). Indeed, "all of the evidence, whether competent or incompetent, which is favorable to the State is to be considered by the court" in ruling on a motion to dismiss for insufficient evidence. *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980); *State v. McKinney*, 288 N.C. 113, 117, 215 S.E.2d 578, 581-82 (1975). Our Supreme Court has stated that

[i]n passing on a motion for nonsuit, evidence favorable to the State is to be considered as a whole in order to determine its sufficiency. This is especially necessary in a case, such as ours, when the proof offered is circumstantial, for rarely will one bit of such evidence be sufficient, in itself, to point to a defendant's guilt.

*State v. Thomas*, 296 N.C. 236, 244-45, 250 S.E.2d 204, 209 (1978).

Therefore, our Court in *Hemphill* was required to examine all of the State's evidence to determine whether it was sufficient to permit a rational jury to find the existence of malice beyond a reasonable doubt. *See, e.g., State v. Evans*, 74 N.C. App. 31, 327 S.E.2d 638 (1985), *aff'd per curiam*, 317 N.C. 326, 345 S.E.2d 193 (1986) (defendant indicted for involuntary manslaughter in killing two-year-old child by violent shaking); *State v. Lane*, 39 N.C. App. 33, 249 S.E.2d 449 (1978) (defendant charged with second degree murder, defendant's motion to dismiss allowed as to second degree murder, and defendant convicted of involuntary manslaughter for death by violent shaking of his seven-month-old baby); *State v. Ojeda*, 810 P.2d 1148 (Idaho Ct. App. 1991) (defendant charged with involuntary manslaughter for death by violent shaking of three-month-old baby); *Com. v. Earnest*, 563 A.2d 158 (Pa. Super. Ct. 1989) (defendant charged with involuntary manslaughter for death by striking and shaking fifteen-month-old child); *see also* N.C. Gen. Stat. § 14-17 (1999) (shaken baby syndrome not included among categories of homicide that are necessarily deemed murder if proven); *State v. Camp*, 286 N.C. 148, 153, 209 S.E.2d 754, 757 (1974) (when public policy requires a change in the

law, it is the duty of the legislature and not the courts to make that change). In *Hemphill* our Court did not limit its examination to the sole issues of whether the defendant shook the baby and whether the baby died from shaken baby syndrome.

Our language and holding in *Hemphill* was later relied upon in *State v. Qualls*, 130 N.C. App. 1, 502 S.E.2d 31 (1998), *aff'd per curiam*, 350 N.C. 56, 510 S.E.2d 376 (1999), a case the State cited in its brief herein, but did not argue. In *Qualls*, the majority of our Court recited the relevant definition of malice, found a similarity between its facts and those in *Hemphill*, and followed *Hemphill* because the defendant had severely shaken the baby, causing its death. *Id.* at 11, 502 S.E.2d at 37. The *Qualls* Court then added that the defendant not only shook the baby but also inflicted more than one severe blow to the left side of the head, causing multiple skull fractures. *Id.* at 11, 502 S.E.2d at 37-38. "Considering all this evidence together and giving the State the benefit of all legitimate inferences which may reasonably be drawn therefrom," we concluded in *Qualls* that the State had presented substantial evidence the defendant acted with malice. *Id.* at 11, 502 S.E.2d at 38. We reemphasize that a defendant's shaking a baby and the baby's death by shaken baby syndrome are not the sole determinants of whether the State has produced sufficient evidence of malice to convict the defendant of murder in a shaken baby syndrome case.

Comparing *Hemphill* and *Qualls* to the case before us, we find both cases to be distinguishable. Significantly, Alexis died several hours after she was shaken. Ms. Conner testified Alexis looked normal more than two hours after defendant said he shook her, and after Ms. Conner went to bed she heard Alexis make familiar noises. By contrast in *Hemphill*, a doctor who examined the baby at 3:50 p.m. believed the victim had been dead for three to four hours, and the defendant stated he shook the baby around 11:30 a.m. The victim in *Qualls* was transported to the hospital by ambulance immediately after the baby began to gag during an incident in which the defendant admitted in one interview to shaking the baby, and after the baby was flown to another hospital he was not breathing and had no brain activity. Furthermore, Alexis was underdeveloped and weak. The evidence did not show she was shaken violently or vigorously and she did not suffer from the same signs of injury as the baby in *Hemphill* or in *Qualls*. Specifically, Alexis did not vomit, have bruises to the brain, or suffer hemorrhaging in her lungs, as in *Hemphill*; nor did she have multiple external injuries, as in *Qualls*.

Nevertheless, we must review the evidence in the light most favorable to the State to determine whether the State presented sufficient evidence of malice so as to charge defendant with murder. The evidence shows defendant was not the father of Alexis, who was an underdeveloped and weak child. Ms. Connor said defendant acted "paranoid and jumpy" when he asked her where she was going both times she left her bed on the night of 19 February 1998. Furthermore, defendant dressed Jaylenn the next morning, which was atypical, and woke Ms. Connor by telling her they were running late. Defendant also later said "you know they are going to try and blame this on us."

A police officer and medical technician described defendant as nervous and distraught, and defendant asked Ms. Conner if she planned to request an autopsy. Dr. Wittenberg testified that Alexis died from shaken baby syndrome, which he said was caused by more than a light shaking. Finally, defendant did not mention the shaking incident at the first interview with police, but only after the results of the autopsy were made known to him. During his second interview, defendant said he "became frustrated and started shaking Alexis" but did not "realize that he was shaking her that hard" and that he did not mean to hurt her.

These facts fail to present substantial evidence of malice, an essential element of second degree murder. *See Elliott*, 344 N.C. at 266-67, 475 S.E.2d at 212. Specifically, the facts do not satisfy the *Wilkerson* definition of malice employed in *Hemphill* and *Qualls* requiring "not only a particular animosity 'but also wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind utterly regardless of social duty and deliberately bent on mischief, though there may be no intention to injure a particular person[.]' " *See Wilkerson*, 295 N.C. at 578, 247 S.E.2d at 916. Instead, the evidence is sufficient only to raise a suspicion or conjecture of malice required for a conviction of second degree murder. *See Malloy*, 309 N.C. at 179, 305 S.E.2d at 720. Thus, the trial court erred in denying defendant's motion to dismiss the charge of second degree murder.

[2] Defendant also argues the trial court erred in its jury instructions on the State's burden of proof. Specifically, defendant contends that the following instruction on circumstantial evidence was error:

The law simply requires the party having the burden of proof on a particular issue to satisfy the jury as to that issue by the greater weight of all the evidence in the case.

In a criminal case the State must prove a defendant's guilt beyond a reasonable doubt, not by the greater weight of all the evidence in the case.

> It is fundamental that evidence must satisfy a jury of guilt beyond a reasonable doubt before conviction of crime is authorized. A finding of guilt by the greater weight of the evidence cannot be sustained in a criminal prosecution. A charge that a jury may convict on the greater weight of the evidence is error.

*State v. Orr*, 260 N.C. 177, 181, 132 S.E.2d 334, 337 (1963). We recognize that this erroneous reference by the trial court to the greater weight of the evidence appears in the jury instructions among nearly twenty references to the correct burden of proof of guilt beyond a reasonable doubt. Nonetheless, in anticipation of defendant's new trial, we emphasize that "a correct charge is a fundamental right of every accused." *Id.*

New trial.

Judges JOHN and HUNTER concur.