STATE OF NORTH CAROLINA v. JAMES RUSSELL SMITH, JR.

No. COA00-616

(Filed 4 September 2001)

**1. Homicide— second-degree murder—shaken baby syndrome—motion to dismiss—defendant as perpetrator—sufficiency of evidence**

The trial court did not err in a shaken baby syndrome case by failing to grant defendant stepfather's motion to dismiss the charge of second-degree murder for the death of his wife's two-year-old daughter on the basis that there was allegedly insufficient evidence of defendant being the perpetrator of the offense, because the evidence taken in the light most favorable to the State reveals that: (1) defendant had the child in his exclusive care during the time period the injuries were sustained that resulted in the child's death; (2) the wife did not check on the child when she returned home from work or during the night, but the child was alive and conscious when the wife left the child to go to work that afternoon; (3) defendant admitted to an investigator that defendant consumed alcohol that evening and that he might have popped the child in the mouth and that he could have slapped her across the face; (4) defendant told the investigator that he had shaken the child on prior occasions; and (5) while defendant presented some evidence to show his wife abused the child and that there existed a possibility that his wife caused the child's death, this evidence was merely an alternative theory as to the identity of the perpetrator of the offense.

1

STATE v. SMITH

[146 N.C. App. 1 (2001)]

2. **Homicide— second-degree murder—shaken baby syndrome—motion to dismiss—malice—sufficiency of evidence**

The trial court erred in a shaken baby syndrome case by failing to grant defendant stepfather's motion to dismiss the charge of second-degree murder for the death of his wife's two-year-old daughter based on the State's failure to present substantial evidence that defendant had the necessary malice and the case is remanded for sentencing and entry of judgment finding defendant guilty of involuntary manslaughter, because: (1) the State failed to present any direct evidence that defendant inflicted the lethal blow to the child's head with the degree of recklessness required to find malice; (2) the evidence failed to establish the cause of the child's head injury and whether the injury was the result of an intentional and willful act or the result of an accident; (3) the fact that defendant admitted to having physically disciplined the child that evening does not support a finding of malice; (4) the State failed to present evidence of previous acts of child abuse which might permit an inference of malice; and (5) defendant cooperated with police, appeared upset at the child's death, made the 911 call, and attempted to revive the child by administering CPR.

Judge TYSON concurring in part and dissenting in part.

Appeal by defendant from judgment entered 15 December 1999 by Judge J. B. Allen, Jr. in Orange County Superior Court. Heard in the Court of Appeals 18 April 2001.

*Attorney General Michael F. Easley, by Special Deputy Attorney General Steven M. Arbogast, for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Mark D. Montgomery, for defendant-appellant.*

HUNTER, Judge.

James Russell Smith, Jr. ("defendant") appeals the trial court's judgment convicting him of the second degree murder of his wife's two-year-old daughter, Amanda. We hold that the trial court erred in failing to grant defendant's motion to dismiss because the State failed to present substantial evidence that defendant had the necessary malice to sustain a second degree murder conviction. Therefore, we reverse and remand.

The evidence presented at trial tended to show that on 21 November 1998, defendant married Angelene Smith ("Angie"). At the time of the incident in question, the couple had one child born of their relationship, and three other children (including Amanda) from prior relationships living with them. Because defendant worked first shift (6:00 a.m. to 3:30 p.m.) and Angie worked second shift (4:00 p.m. to 12:00 midnight), it was customary for defendant to care for the children while Angie was at work, and for Angie to care for the children while defendant was at work.

On Monday, 7 December 1998, Amanda was ill, and Angie left her in the care of defendant. On Tuesday, 8 December, Amanda threw up, and "defendant bathed and cleaned up Amanda." Later, Angie noticed a bruise on Amanda's forehead and asked defendant how it came to be. Defendant told Angie that Amanda fell off the toilet in the bathroom and bumped her head. On Wednesday, 9 December, Amanda was still ill. Angie cared for her during the day and left her in defendant's care that evening. When Angie returned home after midnight that same night, she did not check on Amanda. After she and defendant went to bed, Angie got up during the early morning hours on 10 December and went to get her infant daughter, Angelica, bringing her back to bed with herself and defendant. Later, when the alarm clock rang at 5:30 a.m. for defendant to go to work, Angie woke defendant who then got up, got dressed, and after checking on Amanda, came back into the bedroom and told Angie that Amanda was dead. Both of defendant's sons were also in the home the night of the incident.

At trial, the State asked Angie if she had ever noticed any bruises on Amanda and, if so, whether she had inflicted them. In response, Angie testified that the day before she married defendant she noticed "purplish" bruises on both of Amanda's arms. She stated, "[i]t looked like somebody had grabbed her." Angie further testified that she noticed a yellow "bruise on [Amanda's] butt[ocks]" a few days after the wedding. Angie also stated that she noticed Amanda's "eyes were black and blue" on or about 3 December 1998. Angie stated that, although she asked defendant about the bruises on Amanda's arms and buttocks, she did not ask about Amanda's black eyes. She testified that she never inflicted any injuries on Amanda and that, aside from the bump on the forehead, these were the only bruises she had ever noticed on Amanda.

Angie further testified that the Department of Social Services ("DSS") had intervened in her relationship with Amanda in response to a report that she abused Amanda by violently grabbing Amanda's

arm. However, as to this report of abuse, Angie testified that "[t]here is no evidence showing that I had done that at all. [DSS] was just assuming that I had grabbed her by her arm. I did not do that." Angie did testify that prior to the time that defendant moved in with her she noticed "bruises on [Amanda's] legs." Angie told several people that she did not believe defendant hurt the child; however, Angie testified that at the time defendant told her of Amanda's death, he stated, "they['re] going to come and get [me]."

Kim Barkhurst, the DSS child abuse investigator, testified that she met Angie and defendant when she began investigating another DSS employee's (Deana Smith) complaint of abuse against Angie. Ms. Barkhurst stated that Ms. Smith had filed a report of abuse against Angie in which Ms. Smith stated "not only had she seen [Angie] jerk [Amanda]'s arm, but . . . also . . . that she had seen [Angie] pop [Amanda] in the face and on the leg" while the two were in Ms. Smith's office. Ms. Barkhurst further testified that Angie ignored Amanda during a visit to defendant and Angie's home, and defendant seemed resentful of Ms. Barkhurst's being there.

Lisa Mendez, one of Angie's supervisors at work, testified that Angie called work on the morning Amanda died, sounding like her "normal self," to say she would not be in to work that day. When Ms. Mendez asked why she was not coming to work, Angie said, "my baby's dead." However, Ms. Mendez further stated that Angie told her she had not checked on Amanda nor had she called 911. Ms. Mendez advised Angie to hang up the phone with her and to call 911. Ms. Mendez testified that she was disturbed by her conversation with Angie, and that she called the sheriff's department that same day "asking to speak to someone that was in charge of the case." Ms. Mendez "attempt[ed] to report the phone call that [she] received or the things that [she] observed to the authorities[.]" However, when she "did speak to someone, . . . they told [her] they had all the information that they needed, thanks for calling."

Molly Malden, another of Angie's co-workers, testified that when she met Angie approximately one to two weeks after Amanda died, Angie "was real bubbly and giddy, and . . . reminded [her] of a teenager." Ms. Malden further testified that she never saw Angie upset about Amanda's death even though she and Angie spent a great deal of time together. Ms. Malden testified that Angie would get upset only when a police officer or detective would come by her job and talk to her. Ms. Malden testified that, after such incidents, Angie would say "that she was going to go to jail, or she was going to be

arrested. . . . They were going to come and take her on her job and take her to jail." Ms. Malden further stated, "they thought that she was guilty of having something to do with the—with the death of the child." The one time Ms. Malden saw Angie dressed up, Angie said that "she was celebrating" and that "she had made some decisions, that she was going back to school, she had signed over custody to Social Services to have her [other] baby adopted, and that she was getting on with her life, that it was time for her to do that."

Christina Alexander (one of Angie's neighbors) testified that she met Angie in February 1997 and that they became friends, spending a great deal of time together with their children. It was her perception that Angie and Amanda had a good relationship at times. However, Ms. Alexander noted that sometimes Angie would mistreat Amanda by slamming her down on the couch, yanking her by the arms, or smacking her in the face. Also, she noted that Amanda would have bruises on her upper arms and legs. Finally, she testified that Angie would treat Amanda this way when she became angry and not for disciplinary reasons. Ms. Alexander had contacted DSS about Angie's treatment of Amanda.

Deana Smith was Angie's case worker at the Alamance County Social Services office. Ms. Smith made the initial call to Child Protective Services after a visit with Angie and Amanda at her office in August 1998 for a case review. During that meeting, Amanda began acting up and Ms. Smith observed Angie jerk Amanda by the arm, pop her on the mouth, and slap her on the leg. Ms. Smith testified that Angie seemed frustrated and angry with Amanda and that they did not have a normal mother-child relationship.

On cross-examination by the State, Ms. Smith admitted that Amanda would not obey Angie and acted in an uncontrollable manner. Furthermore, she agreed that the only way for Angie to keep Amanda under any semblance of control was for her to grab and hold onto Amanda. Finally, Ms. Smith testified that she did not notice any bruises on Amanda, despite the fact that Amanda was wearing an outfit that left her arms and legs bare, and that she would have noticed if there had been any bruises due to Amanda's close proximity in the office.

Dr. Thomas Clark, the forensic pathologist who performed the autopsy on Amanda, testified for the State that during his external examination of Amanda he found "bruises of varying ages distributed over the body from the top of the head to the legs, and even one on

the foot." "The shape and distribution of the bruises was [sic] often in a pattern suggestive of an adult hand." Regarding his internal exam of Amanda, Dr. Clark stated that the brain was bloody and that "there was blood present on both sides of the brain." He testified that any blood in this space is abnormal and that the brain was bruised. Also, Dr. Clark noted the presence of blood in the retinas of Amanda's eyes and that "[t]he presence of blood in the retina is almost always a result of injury." He testified that this indicated that Amanda suffered injury to the head.

Additionally, Dr. Clark explained that shaken baby syndrome "includ[es] the presence of subdural hemorrhage in the head, the presence of retinal hemorrhages in the eyes, and optionally, the presence of hemorrhage within the spinal cord," of which Amanda had all three. He testified that these injuries occur from the violent shaking of a child "so that the head snaps back and forth enough that blood vessels are ruptured, causing the bleeding within the eyes and . . . surrounding the brain." Furthermore, he stated that he found bruises on Amanda's head and all over her body indicating the occurrence of blunt force injury. He then concluded that blunt force injury played a significant role in Amanda's death and that shaking probably contributed.

On appeal from his conviction for second degree murder, defendant raises two assignments of error. First, defendant assigns error to the trial court's denial of his motion to dismiss. Specifically, defendant argues that there was insufficient evidence: (1) as to him being the perpetrator of Amanda's death; (2) as to him having the required malice for second degree murder; and (3) as to him having intentionally inflicted a fatal injury on Amanda. We disagree with defendant on the identity issue, but we agree with defendant on the malice issue. Because we find that the evidence as to defendant having the necessary malice was not substantial enough to withstand defendant's motion to dismiss, we need not address the sufficiency of the evidence as to whether the injury was inflicted intentionally.

The applicable standard for ruling on a defendant's motion to dismiss has been set forth in considerable detail by our Supreme Court:

> When a defendant moves for dismissal, the trial court is to determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense. Whether evidence presented

constitutes substantial evidence is a question of law for the court. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." The term "substantial evidence" simply means "that the evidence must be existing and real, not just seeming or imaginary." The trial court's function is to determine whether the evidence will permit a reasonable inference that the defendant is guilty of the crimes charged. "In so doing the trial court should only be concerned that the evidence is sufficient to get the case to the jury; it should not be concerned with the weight of the evidence." It is not the rule in this jurisdiction that the trial court is required to determine that the evidence excludes every reasonable hypothesis of innocence before denying a defendant's motion to dismiss.

In ruling on a motion to dismiss:

"The evidence is to be considered in the light most favorable to the State; the State is entitled to every reasonable intendment and every reasonable inference to be drawn therefrom; contradictions and discrepancies are for the jury to resolve and do not warrant dismissal; and all of the evidence actually admitted, whether competent or incompetent, which is favorable to the State is to be considered by the court in ruling on the motion."

*State v. Vause*, 328 N.C. 231, 237, 400 S.E.2d 57, 61 (1991) (emphasis omitted) (citations omitted). This standard, requiring substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense, applies whether the evidence is direct, circumstantial, or both. *See State v. Thomas*, 296 N.C. 236, 244, 250 S.E.2d 204, 208 (1978).

[1] Defendant argues that there was insufficient evidence of defendant being the perpetrator of the offense because "[t]he physical evidence did not point to either Angie or the defendant as the culprit, although each had ample time alone with the child to commit the act." Additionally, defendant asserts that during the relevant time period in which Amanda received the fatal blunt force trauma to the head, both defendant and Angie had exclusive control of Amanda at some point and consequently that the evidence could not support a finding that he inflicted the fatal injury.

Taking the State's evidence as true and making all reasonable inferences in favor of the State, the evidence as to defendant being

the perpetrator of the murder was sufficient to withstand defendant's motion to dismiss. Defendant had Amanda in his exclusive care between approximately 4:00 p.m. until midnight on the night before she was discovered dead. Angie testified that she did not check on the child when she returned home from work or during the night. By all accounts, Amanda was alive and conscious when Angie left the child to go to work that afternoon. Defendant admitted to Investigator Thorpe that he consumed alcohol that evening, that he "might" have "popped" Amanda in the mouth, and that he "could have" slapped her across the face. Defendant also told Investigator Thorpe that he had shaken Amanda on prior occasions, but that he always stops when Amanda cries because he realizes he is hurting her.

As defendant correctly notes, if the evidence raises no more than a suspicion that the defendant committed the charged offense, then the evidence is not sufficient to carry the case to the jury. *See State v. Byrd*, 309 N.C. 132, 139-40, 305 S.E.2d 724, 730 (1983). While defendant presented some evidence to show that Angie abused Amanda and that there existed a possibility that Angie caused Amanda's death, this is merely an alternate theory as to the identity of the perpetrator of the offense. As noted above, it is not required for purposes of a motion to dismiss that the evidence exclude every reasonable hypothesis of innocence. *See Vause*, 328 N.C. at 237, 400 S.E.2d at 61. Thus, although there is some evidence that Angie could have been involved, such evidence does not remove from consideration the evidence tending to implicate defendant as the perpetrator. Since the evidence was sufficient to permit a reasonable inference that defendant was the perpetrator of the offense charged, the trial court did not err in denying defendant's motion to dismiss on this basis.

[2] Defendant also argues that the court erred by denying his motion to dismiss on the grounds that the evidence was insufficient to support a finding of malice. We agree with defendant that there was insufficient evidence of malice. Therefore, we reverse the trial court's ruling denying defendant's motion to dismiss, and we vacate the judgment for second degree murder. As discussed in further detail below, we further remand this case to the trial court for sentencing and entry of judgment finding defendant guilty of involuntary manslaughter. *See State v. Vance*, 328 N.C. 613, 403 S.E.2d 495 (1991).

Second degree murder is defined as "the unlawful killing of a human being with malice but without premeditation and deliberation." *State v. Flowers*, 347 N.C. 1, 29, 489 S.E.2d 391, 407 (1997), *cert.*

*denied*, 522 U.S. 1135, 140 L. Ed. 2d 150 (1998). Malice is an essential element of second degree murder, and "[w]hile an intent to kill is not a necessary element of murder in the second degree, that crime does not exist in the absence of some *intentional act sufficient to show malice.*" *State v. Lang*, 309 N.C. 512, 524, 308 S.E.2d 317, 323 (1983) (emphasis added). Our Supreme Court has recognized three types of malice in homicide cases:

> [I]n our law of homicide there are at least three kinds of malice. One connotes a positive concept of express hatred, ill-will or spite, sometimes called actual, express, or particular malice. Another kind of malice arises when an act which is inherently dangerous to human life is done so recklessly and wantonly as to manifest a mind utterly without regard for human life and social duty and deliberately bent on mischief. Both these kinds of malice would support a conviction of murder in the second degree. There is, however, a third kind of malice which is defined as nothing more than "that condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification."

*State v. Reynolds*, 307 N.C. 184, 191, 297 S.E.2d 532, 536 (1982) (citations omitted). The second kind of malice, which the State argues is the kind of malice present here, has been described as follows:

> This kind of malice . . . "comprehend[s] not only particular animosity 'but also wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty and deliberately bent on mischief, though there may be no intention to injure a particular person.' "

*State v. Blue*, 138 N.C. App. 404, 409, 531 S.E.2d 267, 272 (2000) (quoting *State v. Wilkerson*, 295 N.C. 559, 578, 247 S.E.2d 905, 916 (1978), quoting 21 A. & E. 133 (2d Edition 1902)), *aff'd in part and reversed in part on other grounds*, 353 N.C. 364, 543 S.E.2d 478 (2001). Moreover, this Court has addressed the distinction between the "recklessness of consequences" required for a showing of malice and "recklessness of consequences" within the context of manslaughter. In *Blue*, the Court noted that

> "the distinction between 'recklessness' indicative of murder and 'recklessness' associated with manslaughter 'is one of degree rather than kind.' " [*State v. Rich*, 351 N.C. 386, 393, 527 S.E.2d 299, 303 (2000)] (citation omitted). . . .

STATE v. SMITH

[146 N.C. App. 1 (2001)]

Furthermore, the phrase "recklessness of consequences" contin-
ues to require a high degree of recklessness to prove malice . . . .
Hence, in the case before us we describe malice . . . keeping in
mind that the . . . phrase "recklessness of consequences" denotes
the high degree of recklessness required for murder as opposed
to the lesser degree required for manslaughter.

*Blue,* 138 N.C. App. at 410, 531 S.E.2d at 272.

The necessary malice for second degree murder may be inferred
from the "willful blow by an adult on the head of an infant." *State v.
Perdue,* 320 N.C. 51, 58, 357 S.E.2d 345, 350 (1987). "Willful" has been
defined as an act being done " 'purposely and designedly in violation
of [the] law.' " *State v. Whittle,* 118 N.C. App. 130, 135, 454 S.E.2d 688,
691 (1995) (quoting *State v. Stephenson,* 218 N.C. 258, 264, 10 S.E.2d
819, 823 (1940)).

Here, the evidence established that Amanda's death was the
result of a blunt force injury to the head. However, the State failed to
present any direct evidence that defendant inflicted the lethal blow to
Amanda's head with the degree of recklessness required to find mal-
ice. Moreover, because the evidence failed to establish what caused
the injury to Amanda's head, and whether the injury was the result of
an intentional and willful act or the result of an accident, the evidence
was insufficient to establish an inference of malice.

The forensic pathologist, Dr. Clark, testified that Amanda's death
ultimately resulted from "a blow or blows to the head, or included the
head striking an object." Although he testified that shaking may have
contributed to the death, Dr. Clark admitted that he could not tell to
a certainty that the child had been shaken "because it is possible that
a significant enough blunt force injury can also produce retinal hem-
orrhages." Dr. Clark admitted that he did "not know exactly how the
injuries occurred." Dr. Clark testified that it was difficult to pinpoint
the time of death, and that "[i]t could have been hours" before
Amanda died as a result of the blow, or it was possible that "the
injuries could have been inflicted in as little as forty-five minutes
before [the child] was found." Dr. Clark could not determine whether
all of the bruises were sustained at the time of death; rather, some of
the bruising appeared to have been sustained prior to the time of
death. He testified that the bruises did not "contribute directly to the
death as it resulted from [the] head injury." Dr. Clark did not find any
other evidence of serious injury to the child.

Investigator Thorpe testified that defendant stated that he may have slapped Amanda in the face or popped her in the mouth. Defendant further stated that it was possible he had shaken Amanda, but that when he has done so before, Amanda cries, and he immediately stops. This Court has held that "a defendant's shaking a baby and the baby's death by shaken baby syndrome are not the sole determinants of whether the State has produced sufficient evidence of malice to convict the defendant of murder in a shaken baby syndrome case." *Blue*, 138 N.C. App. at 413, 531 S.E.2d at 274.

The State argues that there was substantial evidence of malice presented at trial, relying upon *State v. Hemphill*, 104 N.C. App. 431, 409 S.E.2d 744 (1991), and *State v. Qualls*, 130 N.C. App. 1, 502 S.E.2d 31 (1998), *aff'd*, 350 N.C. 56, 510 S.E.2d 376 (1999). However, we believe these cases may be distinguished based upon the same reasoning set forth by this Court in *Blue, supra*. In *Blue*, we noted that in *Hemphill*, the pathologist found significant evidence of shaken baby syndrome, including vomiting, hemorrhaging in the lungs, and bruises on the front and back of the brain. The pathologist testified that death resulted from " 'violent or vigorous' " shaking. *Blue*, 138 N.C. App. at 411, 531 S.E.2d at 273 (quoting *Hemphill*, 104 N.C. App. at 432, 409 S.E.2d at 744). The defendant admitted that he had shaken the baby several times shortly before her death, despite the child's continuous vomiting. *Id.*

While the *Hemphill* Court determined that sufficient evidence of malice existed, we noted in *Blue* that the *Hemphill* Court "did not limit its examination to the sole issues of whether the defendant shook the baby and whether the baby died from shaken baby syndrome." *Id.* at 413, 531 S.E.2d at 274. Rather, the holding "was based on all of the State's evidence and not solely on the two factors that the 'defendant shook the baby' and 'the cause of death was "Shaken Baby Syndrome." ' " *Id.* at 412, 531 S.E.2d 273 (quoting *Hemphill*, 104 N.C. App. at 434, 409 S.E.2d at 745).

The *Blue* Court also distinguished *Qualls*, noting that, in *Qualls*, this Court found sufficient evidence of malice in the defendant's abuse of the victim, and the victim's resulting death from subdural hemorrhaging. *Id.* (citing *Qualls*, 130 N.C. App. at 11, 502 S.E.2d at 38). In that case, however, the evidence established that the defendant "previously inflicted a severe blow to . . . the victim's head." *Qualls*, 130 N.C. App. at 11, 502 S.E.2d at 37-38. In addition, the forensic pathologist testified that the contusions on the child's brain were

" 'consistent with more than one episode of intentionally-inflicted injury.' " *Id.* at 11, 502 S.E.2d at 38. The pathologist further testified that the injury to the child's head which lead to his death was " 'not an accidental injury.' " *Id.* at 4, 502 S.E.2d at 34. In citing *Qualls,* we reemphasized in *Blue* that "a defendant's shaking a baby and the baby's death by shaken baby syndrome are not the sole determinants of whether the State has produced sufficient evidence of malice to convict the defendant of murder in a shaken baby syndrome case." *Blue,* 138 N.C. App. at 413, 531 S.E.2d at 274.

In contrast, the State in this case has failed to present any evidence of malice other than the fact of Amanda's injury, that defendant was with the child from 4:00 p.m. until midnight, and that defendant "might" have "popped" Amanda on the mouth or slapped her. The fact that defendant admitted to having physically disciplined Amanda that evening does not support a finding of malice. *See Blue,* 138 N.C. App. at 414, 531 S.E.2d at 275 (no evidence of malice despite defendant's admission that he "became frustrated" with the child and shook the child). Moreover, unlike the pathologist's testimony in *Qualls,* which clearly established an expert opinion that the child's injuries were "intentionally-inflicted" and "not . . . accidental," Dr. Clark admitted that he did "not know exactly how the injuries occurred" or whether the blunt force trauma to the child's head was intentionally inflicted.

In fact, the evidence presented did not establish that the blunt force trauma which caused Amanda's death was administered by an adult hand. Although Dr. Clark opined that some of the bruises to Amanda's body were "suggestive of an adult hand," he testified that such bruises did not "contribute directly to the death as it resulted from [the] head injury." Dr. Clark stated that the blunt force trauma could have been caused either by an object striking the child's head, or by the child's head striking an object. Thus, there is no evidence in the record, beyond suspicion, that the fatal blunt force trauma to Amanda's head was administered by an adult hand. In the absence of such evidence, we do not believe that the evidence supported an inference of malice. *See Perdue,* 320 N.C. at 58, 357 S.E.2d at 350 (malice may be inferred from the "willful blow by an adult on the head of an infant").

In addition, although the evidence did tend to show that Amanda had been abused and Dr. Clark opined that she suffered from battered child syndrome, none of the evidence raises more than a suspicion

that defendant, rather than some other individual, inflicted the prior abuse. To the contrary, Angie testified that she trusted defendant with the children and that she never witnessed defendant mistreat the children. Indeed, evidence was presented tending to establish that Angie could have been responsible for some of the child's prior injuries. Thus, the State failed to present evidence of previous acts of child abuse which might permit an inference of malice. *See State v. Smith*, 61 N.C. App. 52, 57-58, 300 S.E.2d 403, 407 (1983). We also note that the facts show that defendant cooperated with police and investigators, he appeared upset at the child's death, he made the 911 call, and he attempted to revive Amanda by administering CPR.

In sum, although the evidence and circumstances surrounding Amanda's death most certainly raise a suspicion that defendant could have been responsible for the child's blunt force head trauma, the State failed to present substantial evidence of the malice required to support a conviction of second degree murder.

In his second assignment of error, defendant argues that the trial court committed plain error in its instruction to the jury on how to assess whether the evidence supported a conclusion that the injury which caused Amanda's death was intentionally inflicted, as required for second degree murder. Because we find that defendant's conviction for second degree murder must be vacated, we need not consider this matter on appeal.

In the present case, the trial court submitted possible verdicts finding defendant guilty of second degree murder, guilty of the lesser included offense of involuntary manslaughter, or not guilty. The jury convicted defendant of second degree murder, and the judgment for second degree murder which we hold must be vacated was entered upon that verdict. In finding defendant guilty of second degree murder, however, the jury necessarily had to find facts establishing the lesser included offense of involuntary manslaughter. *See State v. Greene*, 314 N.C. 649, 336 S.E.2d 87 (1985). For this reason, we remand this case for judgment as upon a verdict of guilty of involuntary manslaughter. *See Vance*, 328 N.C. at 623, 403 S.E.2d at 501-02.

We hold that the evidence on the issue of malice was not substantial enough to withstand defendant's motion to dismiss on the charge of second degree murder, and we vacate that judgment. We remand this case to the Superior Court, Orange County, for sentencing and entry of judgment finding defendant guilty of involuntary manslaughter.

Reversed and remanded.

Judge WALKER concurs.

Judge TYSON concurs in part and dissents in part in a separate opinion.

TYSON, Judge, concurring in part and dissenting in part.

I concur with the majority that there is sufficient evidence of defendant's identity as the perpetrator of the crime. I respectfully dissent from the majority's holding that there is insufficient evidence that defendant acted with malice. The majority correctly states the law regarding second degree murder and malice. The majority misapplies the law to the facts in this case.

The evidence was sufficient to prove that defendant acted with malice as that element has been defined and applied by this Court and our Supreme Court. I find no error in defendant's conviction of second degree murder.

## I. Malice

The majority's opinion sets forth three types of malice to support a charge of second degree murder. With regard to the second type of malice, the majority distinguishes between a higher and lesser degree of "recklessness" to separate second degree murder from manslaughter. The majority never analyzes why defendant's actions the night of the murder were the lesser "recklessness" to reduce defendant's conviction to involuntary manslaughter.

Their opinion sets forth defendant's statements about what he did and possibly did to Amanda the night of her death. Defendant admitted to: (1) possibly shaking Amanda; and, (2) possibly slapping her face; and, (3) "popping " her mouth; and, (4) possibly hitting her in the head; and, (5) previously shaking Amanda; and, (6) consuming alcohol the night Amanda died.

The majority cites *State v. Blue* for the proposition that mere "shaking" of a baby will not sustain malice. 138 N.C. App. 404, 413, 531 S.E.2d 267, 274 (2000). The majority attempts to buttress that point by stating that the pathologist ("Dr. Clark") was unsure whether shaking alone or a blunt blow to the head caused Amanda's death. However, Dr. Clark testified that Amanda's death was "the result of blunt force injury to the head, including physical injury resulting in

bruises, and in all likelihood including shaking." Dr. Clark also testified that the injuries Amanda suffered "takes more force than a child is likely to sustain in the ordinary activities of daily living." The jury could have reasonably concluded that Amanda's injuries were not "accidental." The majority's implication that the injuries might have been an accident is inconsistent with the entirety of Dr. Clark's testimony. Taken as a whole, Dr. Clark's testimony concluded that these injuries were the result of violent shaking and one or more blunt force injuries to the head administered by an adult.

The majority also discusses mitigating actions by defendant after Amanda's death intending to show a lack of "malice," and that the State presented no evidence that defendant previously abused Amanda. Not only is this factually inaccurate, but their opinion mentions that "[d]efendant further stated that it was possible he had shaken Amanda, but that when *he has done so before*, Amanda cries, and he immediately stops." (emphasis supplied). The opinion concludes that this evidence raises no more than a "suspicion" that defendant inflicted prior abuse. I cannot agree that previous shaking of a twenty-one pound, two-year-old is not "abuse." Our focus should concentrate on whether defendant's actions were malicious the night Amanda died.

Finally, the majority mentions that none of the State's evidence suggested that the blow to the head was administered "willfully or with the degree of recklessness required to find malice." Intent to kill or harm is not an element of second degree murder. Only an intentional act sufficient to demonstrate malice is required. *State v. Lang*, 309 N.C. at 524, 308 S.E.2d at 323.

Here the evidence was sufficient to demonstrate defendant acted with malice. The majority relies on *State v. Blue* to control the result in this case. The facts in this case are distinguishable from *Blue*, and the facts here are more analogous to other infant death cases where malice was shown and convictions of second degree murder were upheld.

### A. *State v. Qualls*

In *State v. Qualls*, 130 N.C. App. 1, 502 S.E.2d 31 (1998), defendant argued that the State's evidence that he may have shaken the baby was insufficient to support malice and his conviction for second degree murder. *Id.* at 10, 502 S.E.2d at 37. The factual similarities of *Qualls* and the present case are compelling. Defendant was home

alone with the *Qualls* victim. The defendant called 911 after victim choked and gaged. The victim was rushed to the hospital and died four days later.

The treating physician testified that:

> [T]here [are] a number of findings on [the victim's] exam . . . that are consistent with a shaking type injury, one of the most remarkable of those being that the hemorrhages, or bleeding, that was seen . . . in the back of . . . the eye or on the retina . . . That, along with the evidence of head trauma and the fractures that were seen on a brain scan and swelling of the brain, taken together, were evidence that . . . this baby had suffered a severe injury and possibly some shaking to cause that swelling . . .

*Id.* at 4, 502 S.E.2d at 33-34.

These injuries are virtually identical to those described in Dr. Clark's testimony in the present case. Two differences are that Amanda did not have a fractured skull, although she did have a blunt blow to the head in addition to injuries sustained from violent shaking. Another difference is that the baby in *Qualls* died four days after being brought into and cared for by the hospital. Amanda never made it to the hospital. She died alone, uncovered, wearing only a diaper.

The defendant in *Qualls* denied responsibility for the severe injuries to the victim. He stated that "he may have accidently kicked or tripped on the victim." *Id.* at 5, 502 S.E.2d at 34. The next day defendant said that "he may have also shaken the victim . . . trying to arouse him." *Id.* At another time "he denied that he either shook, kicked or tripped on the victim." *Id.* As here, defendant in *Qualls* had exclusive control and possession of the victim during the time period the injuries were sustained that resulted in death. This Court found no error in defendant's conviction for second degree murder.

### B. *State v. Hemphill*

In *State v. Hemphill*, 104 N.C. App. 431, 409 S.E.2d 744 (1991) the facts are also similar to the present case.

The defendant in *Hemphill* contended that the "trial court erred in denying his motion to dismiss the charge of second degree murder. He argues that the evidence is insufficient to support a finding of the element of malice." *Id.* at 433, 409 S.E.2d at 745.

STATE v. SMITH

[146 N.C. App. 1 (2001)]

As in the present case, Hemphill was alone with the victim baby. During an interview, defendant initially denied that he had shaken the victim. At trial defendant testified that he "had shaken the child because she was choking, . . ." *Id.* This Court held that "the evidence in the present case is sufficient to support a finding by the jury that defendant acted with malice as defined in *Wilkerson,*" even though no direct evidence linked defendant's conduct to the violent shaking which produced the fatal injuries. *Id.* at 434, 409 S.E.2d at 745. Our Court stated:

> evidence that defendant shook the baby as well as the expert testimony that the cause of death was 'Shaken Baby Syndrome,' which typically results from an infant's head being held and shaken so violently that the brain is shaken inside the skull causing bruising and tearing of blood vessels on the surface of and inside the brain, is sufficient to show that defendant acted with 'recklessness of consequences, . . . though there may be no intention to injure a particular person.'

*Id.*

In *Hemphill* there was no evidence that the baby was "hit about the head, or popped in the mouth." Medical evidence of violent shaking was sufficient to show that defendant acted with the requisite "recklessness of consequences" to sustain his conviction for second degree murder.

The majority's opinion misapplies our central holding in *Hemphill.* Evidence that a person shakes a baby plus expert testimony of head injuries that resulted from violent shaking "is sufficient to show recklessness of consequences" to show malice. In the present case, defendant admitted that "[he] might have [shaken Amanda] . . . [and] it could have been last night." These statements are not mere "suspicion" that defendant shook Amanda. A jury reasonably could have concluded that defendant shook Amanda. Dr. Clark testified that massive injuries to Amanda's head and brain were caused by violent shaking and a blunt force injury to the head.

### C. *State v. Blue*

In *Blue* we emphasized that "a defendant's shaking a baby and the baby's death by shaken baby syndrome are not the sole determinants of whether the State has produced sufficient evidence of malice to convict the defendant of murder in a shaken baby syndrome case." *State v. Blue,* at 413, 531 S.E.2d at 274. This Court in *Blue* found that

the evidence was "sufficient only to raise a suspicion or conjecture of malice . . . " *Id.* at 414, 531 S.E.2d at 275. The Supreme Court remanded the case for sentencing under involuntary manslaughter. *State v. Blue,* 353 N.C. 364, 543 S.E.2d 478 (2001).

The majority relies on *Blue* to support its holding that the evidence does not rise to the level of "recklessness of consequences" to show malice. That reliance is misplaced.

The facts in *Blue* are distinguishable from the facts in this case, *Qualls,* and *Hemphill.* In *Blue* the baby was undeveloped, weak and only two months old. The defendant-father had placed the victim on his knee and began to bounce her to try and get her to stop crying. Defendant said that he probably was not supporting the back of the baby's head properly when he shook her. The pathologist in *Blue* testified that "many small blood vessels on the surface of the brain were torn and bleeding, *but that larger blood vessels were not torn."* *Id.* at 406, 531 S.E.2d at 270 (emphasis supplied). "There were no other internal or external injuries to [the victim's] body . . . ." *Id.* at 407, 531 S.E.2d at 270. The pathologist also testified there were no external head injuries and that the skull was not fractured. "The evidence did not show she was shaken violently or vigorously and she did not suffer from the same signs of injury as the baby in *Hemphill* or in *Qualls."* *Id.* at 413, 531 S.E.2d at 274. No evidence was presented that the baby in *Blue* was either hit or struck. The injuries Amanda sustained are much more severe than those of the victim in *Blue.*

## II. Evidence of Malice

*State v. Blue* emphasizes that we should "examine all of the State's evidence to determine whether it was sufficient to permit a rational jury to find the existence of malice beyond a reasonable doubt." *Id.* at 412, 531 S.E.2d at 273 (citation omitted).

## A. Defendant's Statements

Defendant in the present case did not testify. Defendant did meet twice with investigator Ned Thorpe ("Thorpe"). These meetings produced lengthy recorded statements that were played for the jury for corroboration of the State's evidence.

Defendant-stepfather had the sole care, custody, and control of Amanda from the time her mother left for work at 3:55 p.m. on 9 December until after midnight when Amanda's mother returned home. Defendant admitted to arriving home from work at "about 3:30

p.m." Amanda was asleep on the couch with her mother. Defendant stated that Amanda was "alert," after she awoke. Amanda "got up off the couch, she walked over, [and] got her clothes on . . . ." Defendant stated that he took Amanda and his natural daughter to pick up his two sons at approximately 4:30 p.m. and brought them back for dinner. Around 8:30 p.m. he "got the shoes on the little ones, put their jackets on, we went out to the car so [he] could drop the boys back off." Defendant stated that he, Amanda, and her infant sister arrived back home around 9:20 p.m. Defendant stated that after returning home, Amanda "sat down, took her shoes off, like she normally does inside the back door, come [sic] in and sat down in the living room . . . she was watching TV . . . ." This evidence shows that Amanda was alive, conscious, alert, and ambulatory for more than five hours after Amanda was left in defendant's sole custody.

Defendant stated that he drinks alcohol, and that he had been drinking alcohol the night Amanda died. Detective Thorpe asked "[o]n last evening, December 9th, did you consume any alcohol?" Defendant responded "[y]es I did . . . Probably three beers and a mixed drink." Defendant also stated that he believed he was not drunk and "[t]o consider myself drunk . . . I've drank *over* a 12-pack, and still wasn't." Defendant stated that there was "four or five cases" of beer in the house on the night of Amanda's death.

Thorpe asked defendant, "Mr. Smith let me ask you point blank, this morning, last night, did at any time you strike [Amanda] Cook about the face or head?" Defendant responded that "if I did, I might have popped her in the mouth, she has a bad habit of saying no . . ." Defendant was also asked "Mr. Smith, on December 9th, at any time did you shake [Amanda]?" He responded "I might have, I'm not positive." Later, Thorpe again asked defendant "Mr. Smith . . ., you admitted hitting the child . . . on 12-9-98, when did you shake her last trying to make her stop crying or whatever?" Defendant responded "I can't recall." When asked again "[d]id you shake her last night" defendant stated "[i]t could have been last night, what I—if I realize that I've got her up shaking her, I sit her down and I walk off." When defendant discussed shaking Amanda with Thorpe, he also stated "I realize I go too far when I do that."

The uncontroverted facts in this case and defendant's own statements show that Amanda was conscious and ambulatory when she and defendant returned to the house at approximately 9:20 p.m. on 9 December. Defendant stated that he was "upset" with Amanda and had to "discipline" her that night before putting her to bed around

10:30 p.m. or 11:00 p.m. According to defendant's statements, this discipline included possible shaking, possibly hitting her about the head, and popping her in the mouth; all administered while defendant was under the influence of alcohol. Mrs. Smith testified that she arrived home from work after midnight and never checked on Amanda. Amanda was found dead by defendant when he checked on her at 5:45 a.m. on 10 December. Defendant stated that Amanda was warm but stiff at that time. Amanda's mother testified that after defendant told her that Amanda was dead, the defendant further stated that "they were going to come and get [me]."

After defendant made these statements, he called 911. Defendant stated the paramedics arrived about 15 minutes after the 911 call. Paramedic Pope did not attempt any lifesaving measures on Amanda. Pope testified that Amanda had been dead in "excess of a couple of hours, at least." He testified that Amanda's body was cool and rigor mortis had set in when he had arrived.

### B. Dr. Clark's Testimony

Dr. Clark testified as an expert witness to the extent of Amanda's injuries and the cause of her death as follows: Two year old Amanda was "32 inches tall and weighed 21 pounds." "The external examination of this body showed extensive evidence of injury. There were bruises of varying ages distributed over the body from the top of the head to the legs, and even one on the foot." There were three groups of bruises which were "purple" in color, indicating that they were recent. Dr. Clark stated that "[t]he shape and distribution of the bruises was often in a pattern suggestive of an adult hand." All of the bruises "relate to the cause of death, in that they are the basis for my having called this battered child syndrome, but they don't contribute directly to the death as it resulted from head injury."

As to the head injuries, Dr. Clark testified that the

brain was quite bloody . . . blood [was] present on both sides of the brain . . . [A]pproximately 25 grams [on one side and] 5 grams [on the other]. . . . The brain itself had a bruise or a contusion on it . . . [Also there were bruises on the underside of the scalp, on the top and both sides.] [B]lood was present in the retinas of both eyes . . ., one of them somewhat more than the other . . . The spinal cord also . . . had blood surrounding its membranes, as did the brain.

STATE v. SMITH

[146 N.C. App. 1 (2001)]

Dr. Clark concluded, "I would expect that shaking played at least a part in this death. And by shaking, *I mean picking up the child, shaking the child violently,* so that the head snaps back and forth enough that blood vessels are ruptured, causing the bleeding within the eyes and the bleeding surrounding the brain." (emphasis supplied).

Also the "presence of bruises on top of the head and all over the rest of the body also shows that blunt force injury occurred." "As there were bruises present internally and externally, I concluded that blunt force injury was present and played a significant role in this death." "There was a small amount of hemorrhage or bleeding of the inner upper lip, . . . ."

With respect to the time and cause of death, Dr. Clark testified that "[t]he child could conceivably have lived for a day or more with these injuries. *But not in a conscious state.*" (emphasis supplied). "I think [Amanda] would have been conscious either no time or a very short period of time following these injuries. *Very short meaning measured in minutes.*" (emphasis supplied). The majority's opinion ignores this testimony.

During cross-examination Dr. Clark maintained that "I don't think this child could have behaved normally following these injuries, and the child could have lived in an unconscious state for a period of hours or more than a day. I think if it was a day, there would have been at least some early pneumonia." The autopsy evidence showed none. Dr. Clark concluded that Amanda died as a "result of blunt force injury to the head, including physical injury resulting in bruises, and in all likelihood including shaking."

Clearly, defendant's actions and conduct were as egregious as the defendant's actions in *Qualls* and *Hemphill,* and far worse than those of the defendant in *Blue.* None of the defendants in those cases were under the influence of alcohol when the acts resulting in death were inflicted.

### C. *State v. Perdue*

The majority also correctly points out that our Supreme Court has held that malice may also be inferred from a "willful blow by an adult on the head of an infant." *State v. Perdue,* 320 N.C. 51, 58, 357 S.E.2d 345, 350 (citation omitted). Willfully is defined as "purposely" and "designedly." *State v. Whittle,* 118 N.C. App. 130, 135, 454 S.E.2d 688, 691 (1995).

Defendant admitted to being upset with Amanda and disciplined her sometime during the evening when she was in his exclusive custody. Defendant also admitted to being under the influence of alcohol. During the course of his interviews, defendant vacillated as to whether he hit and shook Amanda, the amount of force used, and adjusted his version of events.

Defendant said he had to strike Amanda because she had a bad habit of saying "no, no, no, no." According to defendant, the purpose of his discipline was to keep Amanda away from her baby sister who, according to defendant, Amanda was pestering. It was the defendant's "conscious object" or "purpose" to strike Amanda. The forensic evidence is overwhelming that the blow or blows to Amanda were from an adult, and, combined with the violent shaking, were significant enough to cause death. A jury could have reasonably concluded that defendant willfully and maliciously struck Amanda's head and violently shook her.

The majority's opinion concludes that "[t]he evidence presented did not establish that the blunt force trauma which caused Amanda's death was administered by an adult hand." This conclusion confuses Dr. Clark's testimony about Amanda's body injuries with her head injuries. Dr. Clark testified that the injuries and bruises to the body were indicative of an "adult hand." The fatal blow and violent shaking which caused Amanda's death were administered by an adult.

The majority's opinion also recites at length Mrs. Smith's bizarre behavior and actions toward Amanda. Without doubt, Mrs. Smith's actions were deplorable and totally inconsistent with those of a loving, natural mother. Mrs. Smith testified at trial and was subjected to a vigorous cross-examination by defense counsel. The jury had a full opportunity to observe her responses and demeanor. Despite Amanda's mother's inexcusable behavior and uncaring neglect, the jury concluded that defendant was guilty of second degree murder and not involuntary manslaughter. Although defendant did not testify in his own defense, his version of the events were heard and considered by the jury through his recorded statements to Detective Thorpe.

Defendant presumably did not testify due to his prior convictions for driving while impaired, misdemeanor child abuse, and indecent liberties with a child. The jury was unaware of defendant's prior record when it returned its verdict of second degree murder. The trial

court determined that there were seven prior record points and imposed a sentence for a minimum term of 220 months and for a maximum term of 273 months, due to these prior convictions. N.C. Gen. Stat. § 15A-1340.17(c) (1997). The trial court ordered this judgment be executed with credit for 371 days of prior confinement.

## III. Summary

The evidence shows that Amanda was sick for several days before her death. The individual that Amanda counted on, and who had a legal duty to protect her and to keep her safe, treated her illness not by caring for her or taking her to the doctor, but with a "pop in the mouth," hitting her in the head, and shaking her. Defendant admitted to consuming at least three beers and a mixed drink on the night Amanda died, and to keeping four to five cases of beer in the home. Defendant also admitted to shaking and spanking Amanda on prior occasions. Dr. Clark testified that Amanda died as a result of violent shaking and a blow or blows to the head administered by an adult.

Viewing this evidence in totality after giving the State the benefit of all reasonable inferences, the jury could have concluded that defendant acted with malice. The facts more than satisfy the *Wilkerson* definition of malice as used in *Hemphill*, *Qualls* and *Blue*. *Wilkerson* requires "wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind utterly regardless of social duty and deliberately bent on mischief, though there may be no intention to injure a particular person." *State v. Wilkerson*, 295 N.C. 559, 578, 247 S.E.2d 905, 916 (1978). The majority mistakenly holds that these facts raise only a suspicion of "recklessness of consequences," and do not show malice. The evidence was sufficient for the jury to conclude that defendant acted with malice to sustain the conviction for second degree murder. I find no error in the jury's verdict or the judgment. Therefore, I respectfully dissent.